LEAGUE OF WILDERNESS DE-FENDERS—BLUE MOUNTAINS BIODIVERSITY PROJECT; Northwest Environmental Defense Center; American Lands Alliance, and Sierra Club, Plaintiffs,

v.

Harv FORSGREN, Regional Forester, Pacific Northwest Region; and United States Forest Service, an agency of the United States Department of Agriculture, Defendants.

No. 01CV1819–HA.

United States District Court,
D. Oregon.

Jan. 30, 2002.

Marc D. Fink, Eugene, OR, for Plaintiffs.

Thomas L. Sansonetti, Gail C. Orendorff, John P. Almeida, U.S. Department of Justice, Environment and Natural Resource Division, General Litigation Section, Washington, DC, Michael Mosman, United States Attorney, Owen L. Schmidt, Special Assistant U.S. Attorney, USDA—Office of the General Counsel, Portland, OR, for Federal Defendants.

Scott W. Horngren, Julie A. Weis, Haglund Kirtley Kelley & Horngren, L.L.P., Portland, OR, for Intervenor–Defendant D.R. Johnson Lumber Company.

## OPINION AND ORDER

HAGGERTY, District Judge.

Plaintiffs filed a complaint seeking declaratory and injunctive relief on December 17, 2001. After moving for a temporary restraining order and a preliminary injunction, plaintiffs withdrew this motion on the stipulation by the parties that defendants agreed to refrain from awarding a salvage logging contract for the "Hash Rock salvage harvest project" (this plan hereinafter referred to as the "Hash Rock project" or "project") until plaintiffs were given two weeks written notice. *See* Stipulation and Order filed December 19, 2001. On January 9, 2002, the parties filed a stipulation regarding a briefing schedule for plaintiffs' anticipated amended complaint and motion for preliminary injunction. The proposed schedule was adopted by the court, and plaintiffs filed an amended complaint and a motion for preliminary injunction on January 11, 2002.

Also pending before the court was a motion to intervene by proposed defendant-intervenor D.R. Johnson Lumber Company. The federal defendants took no position regarding intervention, while plaintiffs filed objections.

## 1. Motion to Intervene

Oral argument regarding the motion to intervene and the motion for preliminary injunction was heard in open court on January 29, 2002. The court first considered the motion to intervene (doc. # 11), and plaintiffs' objections, and subsequently permitted counsel for intervenor to contribute argument regarding plaintiffs' motion for preliminary injunction. The court now clarifies its ruling regarding D.R. Johnson's rights to intervene.

The Ninth Circuit has established a four-part test to intervene as a matter of right under Fed.R.Civ.P. 24(a)(2):

(1) the application for intervention must be timely;

(2) the applicant must have a "significantly protectable" interest relating to the property or transaction that is the subject of the transaction;

(3) the applicant must be so situated that disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect that interest; and

(4) the applicant's interest must be inadequately represented by the existing parties in the lawsuit.

*Churchill County v. Babbitt,* 150 F.3d 1072, 1082, *as amended by* 158 F.3d 491 (9th Cir.1998) (citations omitted).

■ The burden is on the proposed intervenor to establish that the requirements for intervention are met. *Petrol Stops Northwest v. Continental Oil Co.,* 647 F.2d 1005, 1010 n. 5 (9th Cir.), *cert. denied,* 454 U.S. 1098, 102 S.Ct. 672, 70 L.Ed.2d 639 (1981). While there is no dispute as to the timeliness of D.R. John-

son's motion, the company lacks a "significantly protectable" interest in determining whether the federal defendants have complied with the National Environmental Policy Act ("NEPA").

The Ninth Circuit has emphasized that "the federal government is the only proper defendant in an action to compel compliance with NEPA." *Wetlands Action Network v. United States Army Corps of Engineers,* 222 F.3d 1105, 1114 (9th Cir.2000), *cert. denied,* —— U.S. ——, 122 S.Ct. 41, 151 L.Ed.2d 14 (2001) (quoting *Churchill County,* 150 F.3d at 1082). "[B]ecause NEPA requires action only by the government, only the government can be liable under NEPA." *Churchill County,* 150 F.3d at 1082; *see also Forest Conservation Council v. U.S. Forest Service,* 66 F.3d 1489, 1499, n. 11 (9th Cir.1995) (parties other than the Forest Service "cannot claim any interest that relates to the issue of the Forest Service's liability under NEPA..." and the court reiterates that no party but the federal government can be a defendant in such a case) (citation omitted). Accordingly, D.R. Johnson does not possess a significantly protectable interest in whether the United States Forest Service ("Forest Service") is liable under NEPA.

■ D.R. Johnson's alternative argument for permissive intervention into the NEPA liability aspects of this action also fails. A proposed permissive intervenor is required to show that "(1) it shares a common question of law or fact with the main action; (2) its motion is timely; and (3) the court has an independent basis for jurisdiction over the applicant's claims." *Donnelly v. Glickman,* 159 F.3d 405, 412 (9th Cir.1998) (citing *Northwest Forest Resource Council v. Glickman,* 82 F.3d 825, 839 (9th Cir.1996)). D.R. Johnson cannot meet the third element of this test, showing an independent basis for jurisdiction

regarding liability aspects of this action, since—as explained above—only the Forest Service can be held liable under NEPA.

█ The timber company has shown a protectable interest in the remedial phase of these proceedings, however. This court agrees with D.R. Johnson's assertions that it possesses an implied-in-fact contract arising from the conduct of the company and the Forest Service. *See Staley v. Taylor,* 165 Or.App. 256, 262, 994 P.2d 1220, 1224 (2000) (only difference between an implied-in-fact contract and an express contract is means by which the parties manifest agreement; in an implied-in-fact contract, the parties' agreement is inferred from conduct; the two types of contracts have the same legal effect). The company was the only bidder for the Hash Rock project, and has posted what is now a cash guarantee of $72,600 with the Forest Service, and has been assured by the Forest Service that the contract would be awarded to it. *See* Declaration of Gerald N. Keck, D.R. Johnson Resource Manager, at 2–3. D.R. Johnson readied ground and helicopter logging contractors, prepared a performance bond of $73,000, and increased the blanket payment bond for the Ochoco National Forest to $1 million. *Id.* at 3.

Consequently, D.R. Johnson maintains an interest in whether (and what type of) injunctive relief is appropriate if the Forest Service is found liable. When "the injunctive relief sought by plaintiffs will have direct, immediate, and harmful effects upon a third party's legally protectable interests, that party satisfies the 'interest' test of F.R.C.P. 24(a)(2)." *Forest Conservation Council,* 66 F.3d at 1494.

The other two elements of the intervention-as-of-right test are met regarding the remedial aspects of this action, as well. The injunctive relief sought by plaintiffs would necessarily "result in practical im-pairment" of D.R. Johnson's interests. *See Sierra Club v. United States Environmental Protection Agency,* 995 F.2d 1478, 1486 (9th Cir.1993) (quotation omitted). It also cannot be disputed seriously that the company's ability to protect its interests would be hindered if intervention is denied, because it would be deprived of any opportunity to challenge the scope of the injunction. *See Forest Conservation Council,* 66 F.3d at 1498.

The Ninth Circuit recognizes that the final element, requiring D.R. Johnson to show that the existing parties may not adequately represent its interests, is not a strenuous test. "The applicant's burden in showing inadequate representation is minimal: it is sufficient to show that representation *may* be inadequate." *Forest Conservation Council,* 66 F.3d at 1498 (emphasis in original); *see also California v. Tahoe Regional Planning Agency,* 792 F.2d 775, 778 (9th Cir.1986). D.R. Johnson maintains personal interests in fulfilling and benefitting from the implied-in-fact contract regarding the Hash Rock project that fall outside the scope of the general public's interest. "Inadequate representation is most likely to be found when the applicant asserts a personal interest that does not belong to the general public." *Forest Conservation Council,* 66 F.3d at 1499 (quotation marks and citation omitted). This court finds D.R. Johnson has met its burden of showing that its interests may not be adequately represented by the Forest Service in the remedial phase of this lawsuit, and concludes that the company is entitled to intervene as a matter of right in the remedial phase of these proceedings.

Relatedly, the court also recognizes that plaintiff acknowledged the propriety, in the alternative to precluding D.R. Johnson's intervention altogether, of permitting its intervention in the "relief stage of the

case." The court agrees with D.R. Johnson's assertion that remedial aspects of this litigation are intertwined with issues pertaining to determining the merits of plaintiffs' motion for a preliminary injunction, and are at issue presently. Specifically, this court's duty to weigh the relative harms or hardships facing the parties calls into play facts and circumstances that D.R. Johnson is best-suited to present. In this light, the court grants D.R. Johnson's motion to intervene (# 11) in part, and accepts its briefing and the oral argument its counsel provided as it pertains to the remedial aspects of this litigation.

### 2. Motion for Preliminary Injunction

Plaintiffs assert they should be granted a preliminary injunction delaying the award of a contract for the Hash Rock project because they have raised serious questions about whether the Forest Service violated NEPA by (1) failing to adequately assess and disclose the impacts of its post-fire logging proposal; (2) failing to "disclose responsible scientific opinion in opposition to the proposed action, and make a good faith, reasoned response to it" (*see Seattle Audubon Society v. Moseley*, 80 F.3d 1401 (9th Cir.1996)) (NEPA requirements); *Idaho Sporting Congress v. Thomas*, 137 F.3d 1146, 1150 (9th Cir. 1998) (allowing Forest Service to rely on expert opinion without providing hard data either vitiates a plaintiff's ability to challenge an agency action or results in the courts second guessing an agency's scientific conclusions; NEPA requires that the public receive the underlying environmental data from which a Forest Service expert derived her opinion).

### A. Standards

The traditional test used by the United States Court of Appeals for the Ninth Circuit for determining whether a preliminary injunction should issue when "(1) the moving party will suffer irreparable injury if the relief is denied; (2) the moving party will probably prevail on the merits; (3) the balance of potential harm favors the moving party; and (4) the public interest favors granting relief." *Cassim v. Bowen*, 824 F.2d 791, 795 (9th Cir.1987).

Under the alternative test used by the Ninth Circuit, a preliminary injunction may be granted if the moving party can demonstrate "either (1) a likelihood of success on the merits and the possibility of irreparable injury, or (2) the existence of serious questions going to the merits and the balance of hardships tipping in their favor." *Gilder v. PGA Tour, Inc.* 936 F.2d 417, 422 (9th Cir.1991). " 'These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases.' " *Hunt v. National Broadcasting Co.*, 872 F.2d 289, 293 (9th Cir.1989) (quoting *United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 174 (9th Cir.1987)).

"Serious questions" are those "questions which cannot be resolved one way or the other at the hearing on the injunction ...." *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir.1988), *cert. denied*, 490 U.S. 1035, 109 S.Ct. 1933, 104 L.Ed.2d 404 (1989). Serious questions are "substantial, difficult and doubtful" enough to require more considered investigation. *Id.* Such questions need not show a certainty of success, nor even demonstrate a probability of success, but rather "must involve a 'fair chance of success on the merits.' " *Id.*, (quoting *National Wildlife Fed'n v. Coston*, 773 F.2d 1513, 1517 (9th Cir.1985)). When considering the issuance of a injunction in a case in which the court will need to address the environmental impact of a proposed agency action, the court must assume that "environmental injury, by its nature, can seldom be adequately remedied by money damages

and is often permanent or at least of long duration, i.e., irreparable." *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 545, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987). Consequently, where a plaintiff has shown that environmental injury is "sufficiently likely, the balance of the harms will usually favor the issuance of an injunction to protect the environment." *Id.*

Plaintiffs assert they raise serious questions about whether the Forest Service complied with NEPA requirements concerning disclosure and consideration of scientific opposition, and of the cumulative effects of its proposal. Plaintiffs also assert environmental injury without an injunction is "sufficiently likely," meaning "the balance of the harms will usually favor the issuance of an injunction to protect the environment." *See Amoco*, 480 U.S. at 545, 107 S.Ct. 1396.

**B. Procedural background**

The purpose and intent of NEPA is to foster better decision-making and to facilitate informed public participation for actions affecting humans and nature. 42 U.S.C. § 4321; 40 C.F.R. § 1501.1(c). Under NEPA, a federal agency must determine whether a proposed project can be categorized as one requiring a detailed Environmental Impact Statement ("EIS"), or one in which no environmental evaluation is necessary. If the proposed action falls into neither category, then the agency prepares an environmental assessment ("EA") to decide whether the environmental impact of a proposed action is significant enough to warrant preparation of an EIS. 40 C.F.R. § 1508.9. The EA is a "concise public document that briefly provide[s] sufficient evidence and analysis for determining whether to prepare an EIS or a finding of no significant impact." *Id.* Since NEPA requires an EIS for all "major Federal actions significantly affecting the quality of the human environment," 42 U.S.C. § 4332(2)(C), an agency will draft an EA to determine whether its project will "significantly affect" the environment (thereby triggering an EIS).

The preparation of an EA will lead either to a determination that an EIS must be done because of potentially significant environmental impacts, or to a Finding of No Significant Impact ("FONSI"). A FONSI is a finding that the proposal will have no significant impact on the environment and does not need an EIS. In sum, an EA is a "rough-cut, low-budget environmental impact statement designed to show whether a full-fledged environmental impact statement—which is very costly and time-consuming to prepare and has been the kiss of death to many a federal project—is necessary." *Cronin v. U.S. Dept. of Agriculture*, 919 F.2d 439, 443 (7th Cir. 1990).

Public review of an EA is not mandated by the regulatory guidelines for NEPA, but the regulations do require that an agency include the public "to the extent practicable" when preparing an EA. 40 C.F.R. § 1501.4(b).

The Ninth Circuit recognizes that:

NEPA imposes a procedural requirement that an agency must contemplate the environmental impacts of its actions. *Inland Empire Pub. Lands v. United States Forest Serv.*, 88 F.3d 754, 758 (9th Cir.1996) (finding that NEPA is concerned with the process of disclosure, not any particular result). NEPA "ensures that the agency... will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger [public] audience." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989); *Inland Empire*, 88 F.3d at 758. There-

fore, NEPA requires the Forest Service to include an EIS "in every recommendation or report on ... major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). We have held that an EIS *must* be prepared if "substantial questions are raised as to whether a project... *may* cause significant degradation of some human environmental factor." *Greenpeace Action v. Franklin,* 14 F.3d 1324, 1332 (9th Cir.1992) (citation omitted); *Sierra Club v. United States Forest Serv.,* 843 F.2d 1190, 1193 (9th Cir.1988). To trigger this requirement a "plaintiff need not show that significant effects *will in fact* occur," raising "substantial questions whether a project may have a significant effect" is sufficient. *Greenpeace,* 14 F.3d at 1332. *Idaho Sporting Congress,* 137 F.3d at 1149–50 (emphasis in original).

■ Accordingly, to prevail on a claim that the Forest Service violated its statutory duty to prepare an EIS, a plaintiff need only raise substantial questions whether a project may have a significant effect on the environment; the plaintiff does not have to show that significant effects will in fact occur. *Blue Mountains Biodiversity Project v. Blackwood,* 161 F.3d 1208, 1212 (9th Cir.1998), *cert. denied,* 527 U.S. 1003, 119 S.Ct. 2337, 144 L.Ed.2d 235 (1999)("*Blackwood* "), quoting *Idaho Sporting Congress,* 137 F.3d at 1149.

■ If an agency decides an EIS is unnecessary, as the Forest Service did in this case, it must supply a "convincing statement of reasons" to explain why a project's impacts are insignificant. *Save the Yaak Comm. v. Block,* 840 F.2d 714, 717 (9th Cir.1988) (citation omitted). "The statement of reasons is crucial to determining whether the agency took a 'hard look' at the potential environmental impact of a project." *Id.* (citation and quotation omitted).

When examining whether a proposed project will have "significant" impacts on the environment, an agency must evaluate "the degree to which the effects on the quality of the human environment are likely to be highly controversial," and "the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks." *See* 40 C.F.R. §§ 1508.27(b)(4), (b)(5) (NEPA regulations, promulgated by the Council on Environmental Quality, provide guidance to the courts in reviewing an agency's determination of "significance"); *see also Blackwood,* 161 F.3d at 1212.

■ Similarly, there are guidelines for how a court may determine whether the effects on the quality of the human environment "are likely to be highly controversial." In *Blackwood,* the Ninth Circuit held that "controversial" is construed as a substantial dispute about the size, nature, or effect of the major federal action, rather than the existence of opposition to a use. *Blackwood,* 161 F.3d at 1212, citing *Greenpeace,* 14 F.3d at 1335; *see also Sierra Club,* 843 F.2d at 1193 (Forest Service awarded timber contracts containing groves of giant sequoia redwoods without preparing an EIS; after evidence from numerous experts showing the EA's inadequacies and casting serious doubt on the Forest Service's conclusions, the Ninth Circuit held that this was "precisely the type of 'controversial' action for which an EIS must be prepared").

## C. Factual Background

This case involves a group of environmental plaintiffs challenging the Forest Service's plan to allow post-fire salvage logging in the area of the "Hash Rock Fire" in the Ochoco National Forest. The Hash Rock Fire occurred following lightening strikes on August 23, 2000. Approximately 18,500 acres (30 square miles)

burned over the next several days in an area 20 miles northeast from the city of Prineville. Most of the burn-area (13,317 acres) was in the Mill Creek watershed. There were 4,594 acres burned in the Marks Creek drainage, 252 acres burned in the Bear Creek watershed, and 113 acres burned in the Trout Creek watershed. Many forest stands were killed, as well as vegetation in a number of riparian areas in the West Fork of Mill Creek and its tributaries.

On September 7, 2000, the Ochoco Forest Supervisor drafted an Interim Report for the Burned Area Emergency Rehabilitation, seeking funding for aerial seeding, riparian shrub planting, and road treatments. The Forest Service continued to study the effects of the fire, and drafted a final report in January, 2001, that documented the ecological changes in the Mill Creek watershed since the fire.

Also in January, 2001, the Forest Service ("Forest Service") began preparing an EA to consider post-fire salvage logging. Public comment was invited then, during what was referred to as a "scoping process." Eight "scoping comment" letters were received. From this process, the Forest Service developed three key issues to be analyzed: the effects of the proposed action on (1) the quality of water; (2) the quality and quantity of "snag" (dead standing timber) habitat for cavity nesting species, and (3) the risk of increased noxious weed infestation.

The Forest Service developed four action alternatives and one "No Action" alternative. The EA compared and analyzed these five alternatives, and the Forest Service claims it also examined the cumulative effects of the various proposals in conjunction with past, present and future activities in the Hash Rock area.

In May, 2001, the Forest Service sent the EA to 40 members of the public and invited comment. In June, the Forest Service hosted a field trip for interested parties. Four comment letters were received. From these, the Forest Service drafted an appendix that summarized the comments and offered the Forest Service's "Response to Comments."

On September 12, 2001, the Forest Service issued a Decision Notice and a Finding of No Significant Impact (FONSI), adopting Alternative 5 (applying 400–foot buffers in areas where tractors would travel in severely burned, sensitive areas, and retaining some snags, but less than in other alternatives). Under Alternative 5, salvage logging would occur on 752 acres (less than in another alternative, and amounting to under six percent of the burned area in Hash Rock), producing 4.7 million board feet of timber. Trees would be planted on 1,300 acres, and riparian planting would occur on ten miles of stream channel. The Forest Service claims that in this Alternative, "measures to mitigate environmental impacts are extensive and designed to result in minimal impacts," including the 400 foot buffers referred to above, and the commitment to maintaining important snag patches. Under the proposal, helicopter logging is designated for 279 acres, and skyline cable logging is designated for 139 acres. High-impact tractor use is allowed for the remaining 334 acres.

## D. Plaintiffs' Argument

Plaintiffs seek a preliminary injunction on grounds (1) they raise serious questions regarding whether the Forest Service violated NEPA by relying upon an EA that fails to disclose respected opposing scientific evidence and the cumulative impacts of the proposal to the environment, and by failing to prepare an EIS before proceeding to the award of a salvaging contract, and (2) the balance of respective possible

harms favors them because of the likelihood of environmental injury.

Plaintiffs argue the Forest Service improperly disregarded sound scientific evidence that post-fire salvage logging likely results in persistent, significant environmental impacts, and improperly omitted discussion in the EA of the "Beschta report," formally known as the 1995 "Wildfire and Salvage Logging, Recommendations for Ecologically Sound Post–Fire Salvage Management and Other Post–Fire Treatments." The Beschta report found evidence that post-fire logging results in additional significant damage to the ecosystem and suggests that there is no ecological need for immediate human intervention on post-fire landscape. Plaintiffs also argue the EA was inadequate in failing to address the cumulative impacts of the Hash Rock proposal. Plaintiffs assert that the EA failed to fully address the impacts resulting from the Forest Service's bulldozing of 35 miles of firelines and dumping of over 70,000 gallons of chemical fire retardant on the Forest during efforts to contain and extinguish the wildfire. Plaintiffs contend there is no specific discussion about the impacts of these measures, and the cumulative impact of salvage logging, in the EA.

### E. Analysis

Plaintiffs assert serious questions exist concerning whether (1) the Forest Service failed to adequately disclose and consider the Beschta Report and other scientific evidence in the EA; and (2) the Forest Service failed to meet other NEPA standards in not disclosing and discussing cumulative impacts (including the impact of bulldozing and dumping of chemical fire retardants during fire-fighting), and not preparing an EIS in light of the controversy and unknown risks surrounding post-fire salvage logging.

### (1) Consideration of other scientific evidence

The Ninth Circuit has emphasized that the manner in which an agency addresses scientific evidence opposing the agency's plans can promote meaningful public involvement and advances the goals of NEPA: "Agency regulations require that public information be of 'high quality' because '[a]ccurate scientific analysis, expert agency comments, and *public scrutiny* are essential to implementing NEPA.' " *Idaho Sporting Congress,* 137 F.3d at 1151 (citation omitted; emphasis in original).

Plaintiffs argue that there are serious questions as to whether the EA in this case violates NEPA by failing to disclose respected scientific evidence running contrary to the Forest Service's recommendation, and because it fails to explain the differences between the Forest Service's view of likely impacts, and the view of others in the scientific community (including views expressed in the Beschta report).

The Beschta report, an independent report on recommendations for ecologically sound post-fire salvage logging, was prepared before devastating wildfires in 1996. It recommends minimal intrusion into severely burned areas and no salvage logging in sensitive areas including severely burned areas and erosive sites. The Ninth Circuit interpreted the Beschta report as suggesting that rapid harvesting responses after a wildfire may result in unforeseen, detrimental environmental consequences. *Blackwood,* 161 F.3d at 1212 (Ninth Circuit held that the Forest Service's omission of any discussion or consideration of the Beschta report lent weight to environmental plaintiffs' claim that the Forest Service did not take the requisite "hard look" at the environmental consequences of post-fire logging).

Following the issuance of the Beschta report, the Regional Forester directed that

the Forest Service consider the Beschta report within public NEPA documentation for every post-fire project. Despite this, and plaintiffs' repeated requests, as well as the Ninth Circuit's guidance in *Blackwood,* the Forest Service failed to sufficiently address the Beschta report and related scientific evidence in the Hash Rock EA.

Similarly, the Forest Service failed to adequately address its own January, 2000, Literature Review. This Review acknowledges the "intense public debate" regarding post-fire salvage logging, in contradiction to defendants' current denial of any substantive controversy.

The Forest Service contends there is no serious question the EA is adequate because it was prepared by Forest Service specialists who are intimately familiar with the Ochoco National Forest, and who conducted on-the-ground analysis of the project's possible impact on the environment. The Forest Service asserts its specialists complied with the Regional Forester's directive (and the Ninth Circuit's teaching in *Blackwood* ) to include the Beschta report in NEPA documentation by reading it, becoming familiar with it, and including a copy of it in the Administrative Record supporting the EA. The Forest Service argues it gained "ample information" supporting the EA because the specialists began examining the effects of the fire before it even stopped burning, and because these specialists have expertise in analyzing similar projects on the Ochoco and other National Forests. *See generally* Declarations of Jeffrey Boice and James David.

Moreover, the Forest Service criticizes plaintiffs for failing to "present soil samples, water surveys, slope evaluations, or any other significant information that would contradict the effects analysis performed by the Forest Service here." Defendants' Opposition at 11. The Forest Service also emphasizes that plaintiffs rely heavily upon the Beschta report and the

declaration of one expert, George Badura (a former Forest Service soils scientist), who has yet to personally examine the Hash Rock Fire area.

The Forest Service credits itself for "extensively involving" the public in the development of the EA and subsequent FONSI, going beyond what NEPA regulations require for public involvement by soliciting letters during the scoping process, inviting comments after the EA was complete, providing responses to these comments, and conducting a field trip to the area. Defendants criticize plaintiffs for not participating more fully in these opportunities.

The Forest Service distinguishes *Blackwood* by emphasizing what it terms the "major factual differences" between the salvage project in that case and the project at issue here. The *Blackwood* decision addressed the "Big Tower" salvage project, which was over four times the acreage and contemplated six times the timber volume as the Hash Rock project. The Big Tower project also proposed constructing 18 miles of roads, while the Hash Rock project proposes a temporary road of less than a mile. Accordingly, the Big Tower sale "was much larger in magnitude and impact than the Hash Rock Salvage project at issue here." Defendants' Opposition at 13.

Finally, the Forest Service contends the Beschta report is not as significant as plaintiffs claim, because it is six years old, and is more "commentary" than scientific and presents a "macro-level viewpoint... but does not present much in the way of site-specific prescriptions for land managers attempting to implement post-fire projects and activities." Defendants' Opposition at 14–15. After the Regional Forester directed that Forest supervisors who issue FONSIs must explain rejections of the Beschta report, a Forest Service research scientist, Dr. Richard

Everett, drafted what is now referred to as the "Everett Review," finding the Beschta report to be biased toward "custodial management." Everett recommended that the local "land manager is the best individual to integrate opposing scientific views and apply them to on-site conditions." The Everett Review, the Beschta report and the January, 2000, Literature Review were all incorporated into the Administrative Record in support of the EA. Accordingly, the Forest Service argues there is no serious question that its EA adequately contemplated and discussed the opposing viewpoints regarding post-fire salvage logging.

■ This court disagrees. Plaintiffs successfully raise serious questions about the adequacy of the EA's discussion of opposing viewpoints. Defendants' criticisms of plaintiffs' previous participation and of the Beschta report fail to establish they took the "hard look" at post-fire issues as required by NEPA and the Ninth Circuit after *Blackwood*. The *Blackwood* decision, as well as the Regional Forester's post-Beschta report directive, both make clear that some reasoned evaluation of the Beschta report is essential to any salvaging proposal on a forest damaged by wildfire. "Allowing the Forest Service to rely on its own expert opinions without providing hard data either vitiates a plaintiff's ability to challenge an agency action or results in the courts second guessing an agency's scientific conclusions. As both of these results are unacceptable, we conclude that NEPA requires that the public receive the underlying environmental data from which a Forest Service expert derived her opinion." *Idaho Sporting Congress*, 137 F.3d at 1150. Defendants' reliance upon the inclusion of various references and reports in the Administrative Record is insufficient, and fail to further either of NEPA's two primary goals: insuring the agency has fully contemplated the environmental effects of its action; and insuring the public has sufficient information to challenge the agency. *Id.* at 1151.

### (2) Serious Questions Regarding Whether an EIS was Required

Since NEPA requires an EIS for all "major Federal actions significantly affecting the quality of the human environment," 42 U.S.C. § 4332(2)(C), an agency will draft an EA to determine whether its project will "significantly affect" the environment (and, consequently, whether an EIS is triggered). As noted above, an agency must evaluate "the degree to which the effects on the quality of the human environment are likely to be highly controversial," and "the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks." 40 C.F.R. §§ 1508.27(b)(4), (b)(5). The Ninth Circuit defines "controversial" as referring to cases in which there is a substantial dispute about the nature or effect of a major federal action, rather than merely the existence of opposition to a use. *Blackwood*, 161 F.3d at 1212.

Plaintiffs acknowledge that the FONSI in this case addresses, briefly, the significance factor concerning "controversial effects" at page 1535 of the Administrative Record. The FONSI goes on to conclude the Hash Rock proposal has no controversial effects, without discussing the Beschta report, the Regional Forester's directive, or the Literature Review. The issues raised by the Beschta report (and the Regional Forester's and Forest Service's subsequent attention paid to it) suggests strongly that the impacts of post-fire intrusions onto a burned forest are uncertain currently. Defendants attempt to discount this uncertainty, arguing that its specialists have expertise and experience in deal-

ing with post-fire salvage operations, and that the "past experience" of the Forest Service supports the EA. These assertions are unpersuasive, and fall short of the standards required under NEPA. Moreover, the uncertainty is increased because the aggressive fire-fighting tactics employed by the Forest Service—35 miles of firelines were bulldozed, and 72,000 gallons of chemical retardant were dumped on the Hash Rock fire area, including the project area—have yet to be fully analyzed. These factors were discussed only briefly, if at all, in the EA, and contribute to the uncertainty of the project's impacts and give rise to the possibility of unknown risks.

In *Blackwood*, the Ninth Circuit rejected an EA that contained "virtually no references to any material in support of or in opposition to its conclusions. That is where the Forest Service's defense of its position must be found." *Blackwood*, 161 F.3d at 1214. Here, the Forest Service relies upon post-EA submissions and declarations to the court, as well as assurances that its experts were aware of plaintiffs' concerns and considered them, in arguing that there are no uncertainties or unknown risks surrounding the Hash Rock proposal. This is insufficient under NEPA. At the very least, plaintiffs have raised serious questions regarding whether an EIS should have been prepared.

### (3) Cumulative Impacts Inadequately Addressed in the EA

Another ground for asserting an EIS is required concerns the need for adequate consideration of the "cumulative impact" of the governmental action along with other actions that might be individually insignificant, but might become significant when considered cumulatively (grazing, forest practices on adjacent private land, and other past, present or future foreseeable projects). *See* 40 C.F.R. § 1508.7. The Ninth Circuit addressed this issue in *Blackwood:*

A cumulative impact on the environment "results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions...." 40 C.F.R. § 1508.7. Cumulative impacts may result from "individually minor but collectively significant actions taking place over a period of time." *Id.* In determining whether a project will have a "significant" impact on the environment, an agency must consider "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts." 40 C.F.R. § 1508.27(b)(7). If several actions have a cumulative environmental effect, "this consequence must be considered in an EIS."

*Blackwood*, 161 F.3d at 1214 (some citations omitted).

Serious questions exist as to whether the EA for Hash Rock salvaging considered the cumulative impacts to soils resulting from past and on-going timber sales, the 2000 wildfire, the miles of bulldozed firelines, the application of chemical fire retardants, and reasonably foreseeable future projects. The Forest Service refers to statements in the EA that "[e]ven though every proposed or ongoing activity is not specifically mentioned, these activities were considered during the environmental analysis." Defendants' Opposition at 28, citing the Administrative Record at 1231. The Ninth Circuit rejected "general statements about 'possible' effects and 'some risk'" as falling short of the required "hard look" at cumulative impacts. *Blackwood*, 161 F.3d at 1213, citing *Neighbors of Cuddy Mountain v. United States Forest Service*, 137 F.3d 1372, 1380 (9th Cir.1998).

Defendants again go outside of the EA to a "soils report" in the Administrative Record in attempting to assure the court that "cumulative impacts" were consid-

ered. Defendants' expert James David acknowledges in his Declaration (at Para. 43, David Declaration) that the EA lacks a specific section titled "Cumulative Effects," but he asserts (in this litigation) that he did consider the cumulative impacts. The Forest Service explains that it met its requirements for soils analysis through a "combination of local knowledge, walk-through transecting, and aerial photo interpretations."

Much of the defendants' argument here relies upon evidence and documentation found outside of the EA, contrary to the teaching in *Blackwood,* and attempts to fault plaintiffs themselves for not raising soil concerns earlier in the Forest Service's evaluative process. These arguments are unpersuasive, and fail to refute that plaintiffs have raised serious questions as to the Forest Service's failure to address cumulative impacts adequately.

### 3. Balancing Hardships

Because this court finds plaintiffs have successfully raised serious questions going to the merits of the litigation, and that these questions have a fair chance of success on the merits, this court must next turn to determining whether the balance of hardships tip in plaintiffs' favor, before concluding a preliminary injunction is warranted. *See Gilder,* 936 F.2d at 422. As recognized above, this court must assume the kind of potential environmental injury that is of concern to plaintiffs can seldom be adequately remedied by money damages and is often permanent or irreparable. *Amoco,* 480 U.S. at 545, 107 S.Ct. 1396. The balance of harms favors the issuance of an injunction to protect the environment when a plaintiff establishes that such injury is sufficiently likely. *Id.*

Defendant–Intervenor D.R. Johnson raises strong arguments regarding the potential harms it will endure in the face of an injunction. Its affiliate, the Grant Western mill, needs the ponderosa pine logs available from the Hash Rock project to "build the log deck to continue operations through spring breakup," and if the logging is not undertaken now, the present contract would require a delay of nearly six months until the ground dries sufficiently to resume logging operations. Keck Declaration at 4–5. In that time, Keck calculates, the existing value of the Hash Rock's project's ponderosa pine, as well as the value of the douglas and white fir timber, is expected to decrease from 20 to 50 percent, for an estimated loss of $276,000. *Id.* at 5.

D.R. Johnson also contends the environment could suffer harm if the diseased and dead timber is not salvaged, and its deterioration leads to a spread of insect infestation on adjacent or nearby forest lands. The intervenor rejects plaintiffs' concerns about irreparable harm arising from sediment disturbance, Intervenor's Opposition Brief at 16, and disputes plaintiffs' other claims of environmental injury as well, contending that salvaging timber "on snow and frozen ground is a reliable method to protect soil even in areas burned by fire." Declaration of Dale McGreer at p.7.

The economic consequences of an injunction have been considered closely. The difficulty of evaluating the merits of a motion for a preliminary injunction in an environmental action is exacerbated when the dispute concerns the harvest of primarily damaged or dead timber, which may have a diminishing value and which may play host to disease or insect infestation. However, at the heart of the serious questions plaintiffs raise is the uncertainty surrounding the potential impacts post-fire salvage logging may have. Without a more objective, well-reasoned "hard look" from the Forest Service at the likely consequences of such logging, including a balanced and thorough discussion of the applicable, com-

peting scientific views, this court is unable to determine that the balance of hardships favors the parties opposing plaintiffs. Instead, plaintiffs have established that environmental injury is sufficiently likely so as to warrant a finding that the balance of harms favors an injunction. Although the record indicates that a preliminary injunction could present a financial hardship to the Forest Service, the intervenor, and the communities that support the intervenor, this possible financial hardship is outweighed by the potential environmental injury that could be caused in the absence of an injunction. *See Idaho Sporting Congress,* 222 F.3d at 569.

### 4. Conclusion

D.R. Johnson's motion to intervene (# 11) is granted in part, as provided above. As to the motion for preliminary injunction, plaintiffs have demonstrated that serious questions exist as to whether defendants complied with NEPA. The court has considered the relative hardships presented in this difficult case, and concludes that environmental injury is sufficiently likely without an injunction to tip the balance of the harms to favor the issuance of an injunction to protect the environment. Accordingly, plaintiffs' motion for a preliminary injunction (# 15) is granted. The bond in this public interest litigation is waived. *See People ex rel Van De Kamp v. Tahoe Regional Planning,* 766 F.2d 1319, 1325–26 (9th Cir.1985) (court has discretion to dispense with the security requirement where requiring security would effectively deny access to judicial review for a non-profit environmental group). At the hearing, intervenor-defendant presented a *motion under Federal Rule of Appellate Procedure 8 to stay the judgment or order of the court pending appeal.* The motion is denied.

Counsel for plaintiffs shall submit a proposed Order of Injunction after consulting with the opposing parties and determining whether scheduling for briefing and a hearing for issuance of a permanent injunction is necessary. If scheduling is necessary, the draft Order shall provide a proposed schedule. This Order shall be submitted to the court within ten days of the date of this Opinion and Order.

IT IS SO ORDERED.