187 F.Supp.2d 1263 (2002)
LEAGUE OF WILDERNESS DEFENDERSBLUE MOUNTAINS BIODIVERSITY PROJECT, League of Wilderness DefendersCascadia Forest Ecology Education Project, Cascadia Wildlands Project, and Northwest Environmental Defense Center, Plaintiffs,
v.
Elaine ZIELINSKI, in her official capacity as State Director of the Bureau of Land Management for Washington and Oregon, and the Bureau of Land Management, an agency of the United States Department of the Interior, Defendants.
No. CIV.02-75-HA.
United States District Court, D. Oregon.
February 25, 2002.
*1264 *1265 *1266 Christopher G. Winter, Ralph O. Bloemers, Cascade Resources Advocacy Group, Portland, OR, for Plaintiffs.
Michael Mosman, United States Attorney, Thomas C. Lee, Assistant U.S. Attorney, Portland, Roger W. Nesbit, Special Assistant U.S. Attorney, Office of the Regional Solicitor, Portland, OR, for Federal Defendants.
Scott W. Horngren, Julie A. Weis, Haglund Kirtley Kelley & Horngren, L.L.P., Portland, OR, for Intervenor-Defendant D.R. Johnson Lumber Company.

AMENDED OPINION AND ORDER[1]
HAGGERTY, District Judge.
Plaintiffs filed a complaint on January 17, 2002, and then filed a motion on January 18, 2002, seeking a temporary restraining order ("TRO") and a preliminary injunction to halt salvage logging undertaken pursuant to a plan implemented by the Bureau of Land Management ("BLM") to allow logging of over 7 million board feet of timber from an area within the Central Oregon Resource Area that was burned in the Summer 2001 Monument wildfires. The plan, known as the Timber Basin Wildfire Rehabilitation and Timber Salvage, (hereinafter referred to as the "Timber Basin plan," or "the plan"), called for cutting 4.4 million board feet of burned trees and 2.5 million board feet of unburned trees from over 900 acres. The BLM released an Environmental Assessment ("EA") for the Timber Basin plan on October 31, 2001, and on November 28, 2001, the agency signed the Decision Record. On November 29, 2001, the BLM issued the Finding of No Significant Impacts ("FONSI").
On December 13, 2001, plaintiffs filed a "Protest" asking that the plan be stayed and that the FONSI amended so as to ensure compliance with the National Environmental Policy Act ("NEPA"). The Protest was denied. On January 10, 2002, BLM awarded the Timber Basin sale contract to D.R. Johnson, a commercial logging company. The company began cutting trees on January 11, 2002.
On January 24, 2002, a hearing was held addressing plaintiffs' motion for a TRO. At this hearing, this court concluded plaintiffs fell short of the standards necessary for compelling issuance of a TRO, and instead *1267 set a hearing date for plaintiffs' motion for preliminary injunction and ordered the federal defendants to file the Administrative Record ("AR") that was created in support of the Timber Basin plan. The AR was filed, and oral argument and testimony was heard on February 12, 2002, regarding the motion for a preliminary injunction. For the following reasons, plaintiffs' motion for a preliminary injunction is granted in part and denied in part.

STANDARDS
The grant or denial of a preliminary injunction motionor a motion for a TROlies within the equitable discretion of the district court. Chalk v. United States Dist. Ct., 840 F.2d 701, 704 (9th Cir.1988). The Ninth Circuit recognizes two alternative standards for preliminary injunctions. International Jensen, Inc. v. Metrosound U.S.A., Inc. 4 F.3d 819, 822 (9th Cir.1993) (citing Cassim v. Bowen, 824 F.2d 791, 795 (9th Cir.1987)). An order properly issues under the traditional standard if the court determines that (1) the moving party will suffer irreparable injury if the relief is denied; (2) there is a strong likelihood that the moving party will prevail on the merits at trial; (3) the balance of potential harm favors the moving party; and (4) the public interest favors granting relief. Id. at 822; Byron M. v. City of Whittier, 46 F.Supp.2d 1032, 1034 (C.D.Cal.1998). Under the "alternative standard," a temporary restraining order properly issues when a party demonstrates either: (1) a combination of probable success on the merits and the possibility of irreparable injury if relief is not granted; or (2) the existence of serious questions going to the merits and that the balance of hardships tips sharply in its favor. Id.
"Serious questions" are those "questions which cannot be resolved one way or the other at the hearing on the injunction ...." Republic of the Philippines v. Marcos, 862 F.2d 1355, 1362 (9th Cir.1988), cert. denied, 490 U.S. 1035, 109 S.Ct. 1933, 104 L.Ed.2d 404 (1989). Serious questions are "substantial, difficult and doubtful" enough to require more considered investigation. Id. Such questions need not show a certainty of success, nor even demonstrate a probability of success, but rather "must involve a `fair chance of success on the merits.'" Id., (quoting National Wildlife Fed'n v. Coston, 773 F.2d 1513, 1517 (9th Cir.1985)).
"In deciding whether to grant temporary relief, the court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Save Our Summers v. Washington State Dept. of Ecology, 132 F.Supp.2d 896, 899-900 (E.D.Wash.1999) (citations omitted).
The requirement for showing a likelihood of irreparable harm prior to trial increases or decreases in inverse correlation to the probability of success on the merits at trial. Diamontiney v. Borg, 918 F.2d 793, 795 (9th Cir.1990); see also Sun Microsystems, Inc. v. Microsoft Corp., 188 F.3d 1115, 1119 (9th Cir.1999) (these factors represent two points on a sliding scale, such that "the greater the relative hardship to the moving party, the less probability of success must be shown") (citation omitted). The essence of the court's inquiry is whether the balance of equities favors granting preliminary relief. International Jensen, 4 F.3d at 822.
When considering the issuance of an injunction in a case in which the court will need to address the environmental impact of a proposed agency action, the court must assume that "environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." Amoco Production Co. v. Village of Gambell, 480 U.S. *1268 531, 545, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987). Consequently, where a plaintiff has shown that environmental injury is "sufficiently likely, the balance of the harms will usually favor the issuance of an injunction to protect the environment." Id.

PROCEDURAL BACKGROUND
The intent of NEPA is to foster better decision-making and to permit informed public participation for actions affecting humans and nature. 42 U.S.C. § 4321; 40 C.F.R. § 1501.1(c). Under NEPA, a federal agency must determine whether a proposed project can be categorized as one requiring a detailed Environmental Impact Statement ("EIS"), or one in which no environmental evaluation is necessary. If the proposed action falls into neither category, then the agency prepares an EA to decide whether the environmental impact of a proposed action is significant enough to warrant preparation of an EIS. 40 C.F.R. § 1508.9. The EA is a "concise public document that briefly provide[s] sufficient evidence and analysis for determining whether to prepare an EIS or a finding of no significant impact." Id. Since NEPA requires an EIS for all "major Federal actions significantly affecting the quality of the human environment," 42 U.S.C. § 4332(2)(C), an agency will draft an EA to determine whether its project will "significantly affect" the environment (and thereby trigger an EIS).
The preparation of an EA will lead either to a determination that an EIS must be done because of potentially significant environmental impacts, or to a Finding of No Significant Impact ("FONSI"). A FONSI is a finding that the proposal will not have a significant impact on the environment and does not need an EIS.
Public review of an EA is not mandated by the regulatory guidelines for NEPA, but the regulations do require that an agency include the public "to the extent practicable" when preparing an EA. 40 C.F.R. § 1501.4(b).
The Ninth Circuit recognizes that:
NEPA imposes a procedural requirement that an agency must contemplate the environmental impacts of its actions. Inland Empire Pub. Lands v. United States Forest Serv., 88 F.3d 754, 758 (9th Cir.1996) (finding that NEPA is concerned with the process of disclosure, not any particular result). NEPA "ensures that the agency ... will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger [public] audience." Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989); Inland Empire, 88 F.3d at 758. Therefore, NEPA requires the Forest Service to include an EIS "in every recommendation or report on ... major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). We have held that an EIS must be prepared if "substantial questions are raised as to whether a project... may cause significant degradation of some human environmental factor." Greenpeace Action v. Franklin, 14 F.3d 1324, 1332 (9th Cir.1992) (citation omitted); Sierra Club v. United States Forest Serv., 843 F.2d 1190, 1193 (9th Cir.1988). To trigger this requirement a "plaintiff need not show that significant effects will in fact occur," raising "substantial questions whether a project may have a significant effect" is sufficient. Greenpeace, 14 F.3d at 1332.
Idaho Sporting Congress v. Thomas, 137 F.3d 1146, 1149-50 (9th Cir.1998) (emphasis in original).
*1269 Accordingly, to prevail on a claim that a federal agency violated its statutory duty to prepare an EIS, a plaintiff need only raise "substantial questions whether a project may have a significant effect" on the environment; the plaintiff does not have to show that significant effects will in fact occur. Blue Mountains Biodiversity Project v. Blackwood, 161 F.3d 1208, 1212 (9th Cir.1998), cert. denied, 527 U.S. 1003, 119 S.Ct. 2337, 144 L.Ed.2d 235 (1999)("Blackwood"), quoting Idaho Sporting Congress, 137 F.3d at 1149.
If an agency decides not to prepare an EIS, as is the case here, it must supply a "convincing statement of reasons" to explain why a project's impacts are insignificant. Save the Yaak Comm. v. Block, 840 F.2d 714, 717 (9th Cir.1988). "The statement of reasons is crucial to determining whether the agency took a `hard look' at the potential environmental impact of a project." Id.
When examining whether a proposed project will have "significant" impacts on the environment, an agency must evaluate "the degree to which the effects on the quality of the human environment are likely to be highly controversial," and "the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks." See 40 C.F.R. §§ 1508.27(b)(4), (b)(5) (NEPA regulations, promulgated by the Council on Environmental Quality ("CEQ"), provide guidance to the courts in reviewing an agency's determination of "significance"); see also Blackwood, 161 F.3d at 1212.
Similarly, there are guidelines for when courts must determine whether the effects on the quality of the human environment "are likely to be highly controversial." In Blackwood, the Ninth Circuit held that "controversial" is construed as a substantial dispute about the size, nature, or effect of the major federal action, rather than the existence of opposition to a use. Blackwood, 161 F.3d at 1212, citing Greenpeace Action v. Franklin, 14 F.3d 1324, 1335 (9th Cir.1992); see also Sierra Club v. United States Forest Service, 843 F.2d 1190, 1193 (9th Cir.1988) (Forest Service awarded timber contracts containing groves of giant sequoia redwoods without preparing an EIS; after evidence from numerous experts showing the EAs' inadequacies and casting serious doubt on the Forest Service's conclusions, the Ninth Circuit held that this was "precisely the type of `controversial' action for which an EIS must be prepared").

ANALYSIS
The parties have supplemented their arguments pertaining to the motion for a TRO with their respective analyses of the Administrative Record, which is now part of the record before the court. Plaintiffs re-assert the BLM improperly disregarded sound scientific evidence that post-fire salvage logging likely results in "persistent, significant environmental impacts," omitted discussion in the EA of the "Beschta Report,"[2] and addressed these issues only after the decision-making process was complete and portions of the public raised concerns.
Plaintiffs also argue the Record confirms the controversy surrounding the Timber Basin project and the need for a EIS. Plaintiffs refer to the assumption in the Record that a pond on adjacent private lands will adequately reduce sediment activity, despite the lack of an analysis supporting *1270 this or examining the effects of peak flows or flooding. The Record also reveals fire suppression activities created more than two miles of road-building within riparian areas and resulted in 28 stream crossings. These impacts were not fully discussed in the EA.
Relatedly, plaintiffs emphasize their argument that the BLM failed to adequately consider and address cumulative effects ofand reasonable alternatives tothe salvage logging and greentree-thinning aspects of the Timber Basin plan. Additionally, plaintiffs assert the BLM unreasonably excluded an alternative from the EA that provided for restoration of the burned area without any post-fire salvage logging.

I. Do Serious Questions Exist?
In this court's Opinion and Order in League of Wilderness DefendersBlue Mountain Biodiversity Project, v. Forsgren, et al., 184 F.Supp.2d 1058 (D.Or. 2002), the court addressed the Forest Service's failure to fully comply with NEPA in preparing a plan to allow salvage logging in an area damaged by wildfire in the Ochoco National Forest. Many of the same legal issues and arguments are presented in this case regarding the Timber Basin plan and the BLM's attempt to be in compliance with federal law. The plaintiffs here bring similar challenges pertaining to whether the BLM violated NEPA by (1) failing to adequately and fairly address opposing scientific evidence in the EA; (2) failing to prepare an EIS before proceeding to the award of a salvaging contract; (3) failing to consider the cumulative impacts of fire suppression activities, grazing and logging on BLM and adjacent lands; and (4) failing to consider a reasonable range of alternatives, because it excluded a restoration alternative that omitted salvage logging.
Upon careful review of the AR, and after consideration of the parties' briefing and arguments regarding the plaintiffs' motion for a preliminary injunction, and the testimony given at the motions' hearing, this court concludes plaintiffs have established the existence of serious questions going to the merits of whether the BLM complied with NEPA. These questions pertain to the adequacy of the EA's consideration of opposing scientific evidence, whether an EIS was necessary, the adequacy of the consideration of cumulative impacts, and whether the BLM's "reasonable range" of alternatives should have included a "restoration-only" alternative.

(1) Consideration of other scientific evidence
This court agrees that there are serious questions as to whether the EA in this case violates NEPA by failing to disclose respected scientific evidence running contrary to the BLM's final decision to allow salvage logging, and because it fails to address differences between the BLM's view of likely impacts, and the view of others in the scientific community (including views expressed in the Beschta Report). Defendants' reliance upon the inclusion of various references and reports in the Administrative Record is insufficient to meet its requirement that public information be of "`high quality' because `[a]ccurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA.'" Idaho Sporting Congress, 137 F.3d at 1151 (citation omitted; emphasis in original). Plaintiffs successfully raise serious questions about the adequacy of the EA's discussion of opposing viewpoints, and about whether the BLM took the "hard look" at post-fire issues as required by NEPA.

(2) Serious Questions Regarding Whether an EIS was Required
NEPA requires an agency to evaluate "the degree to which the effects on *1271 the quality of the human environment are likely to be highly controversial," and "the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks." 40 C.F.R. §§ 1508.27(b)(4), (b)(5). The Ninth Circuit defines "controversial" as referring to cases in which there is a substantial dispute about the nature or effect of a major federal action, rather than merely the existence of opposition to a use. Blackwood, 161 F.3d at 1212.
Plaintiffs raise serious questions as to whether an EIS should have been prepared. Not only is there an issue as to whether the BLM discounted opposing scientific evidence regarding the merits of post-fire salvage logging, but testimony elicited at the preliminary injunction hearing disclosed that the EA and the AR provide no hard data for the BLM's critical assumption that 10 inches of snow cover adequately mitigates environmental concerns. The BLM appears to have relied upon a summary of a 1975 study for this assumption. The study itself is not in the AR, and no one within the BLM could be identified as having read the study.
A federal agency's defense of its positions must be found in its EA. Blackwood, 161 F.3d at 1214. Here, the EA appears inadequate. Plaintiffs have raised serious questions regarding whether an EIS should have been prepared.

(3) Cumulative Impacts Inadequately Addressed in the EA
Another ground for asserting an EIS is required concerns the need for adequate consideration of the "cumulative impact" of the governmental action along with other actions that might be individually insignificant, but might become significant when considered cumulatively (grazing, forest practices on adjacent private land, and other past, present or future foreseeable projects). See 40 C.F.R. § 1508.7. The Ninth Circuit addressed this issue in Blackwood:
A cumulative impact on the environment "results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions...." 40 C.F.R. § 1508.7. Cumulative impacts may result from "individually minor but collectively significant actions taking place over a period of time." Id. In determining whether a project will have a "significant" impact on the environment, an agency must consider "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts." 40 C.F.R. § 1508.27(b)(7). If several actions have a cumulative environmental effect, "this consequence must be considered in an EIS."
Blackwood, 161 F.3d at 1214 (some citations omitted).
Serious questions exist as to whether the EA for the Timber Basin project adequately considered the applicable cumulative impacts. For example, the extent to which the EA addressed the impacts of fire-fighting activities in the Timber Basin area was insufficient, and the agency's attempts to allay concerns such as these now, in this litigation, violate an essential purpose of NEPAto facilitate informed public participation for actions affecting humans and nature. See 42 U.S.C. § 4321; 40 C.F.R. § 1501.1(c). The Oregon Department of Fish and Wildlife presented "initial comments" prior to the EA concerning "a loss of big game hiding and thermal cover resulting from the cumulative effects of the fire, logging, grazing, and other management activities on adjoining private lands." AR at 427. Plaintiffs establish the existence of serious questions as to whether the EA adequately addressed these concerns, as well.

*1272 (4) Reasonable Range of Alternatives
Finally, plaintiffs also raise serious questions as to whether the BLM adequately provided the public with a restoration alternative. The AR discloses that a "rehabilitation-only" alternative was considered initially, but the EA presented three action alternatives, and each included salvage logging. Although defendants respond by referring to elements of a restoration alternative that can be found in the EA, and by arguing that a rehabilitation-only alternative would be "inconsistent" with the applicable Resource Management Plan, which calls for commercial logging in the Timber Basin area, these arguments fail to dispel the serious questions plaintiffs raise on this issue. Undisputed testimony at the preliminary injunction hearing indicated the Resource Management Plan does not preclude rehabilitation-only alternatives. There is a serious question as to whether the BLM's failure to include a restoration-only alternative thwarted NEPA's two primary goals: insuring the agency has fully contemplated the environmental effects of its action; and insuring the public has sufficient information to challenge the agency. Idaho Sporting Congress, 137 F.3d at 1151.

II. Balancing Hardships
Because this court finds plaintiffs have successfully raised serious questions going to the merits of the litigation, and that these questions have a fair chance of success on the merits, this court must next turn to determining whether the balance of hardships tip in plaintiffs' favor before concluding a preliminary injunction is warranted. See Gilder, 936 F.2d at 422. This court must assume the kind of potential environmental injury that is of concern to plaintiffs can seldom be adequately remedied by money damages and is often permanent or irreparable. Amoco, 480 U.S. at 545, 107 S.Ct. 1396.
However, in this case, the balance of harms has been affected dramatically by the reality that much of the salvage logging is complete. Testimony at the preliminary injunction hearing indicated that virtually all of the logging is complete, and all that remains is removal of the "decked" logs and some helicopter removal. As in this court's consideration of similar litigation pertaining to salvage logging in the Hash Rock area of the Ochoco National Forest, the economic consequences of an injunction have been considered carefully. Again, the difficulty of weighing relative harms arising from a preliminary injunction in an environmental action is exacerbated when what is at issue is the harvest of damaged or dead timber having a diminishing value and a vulnerability to disease or insect infestation. This court concludes the balance of harms favors the issuance of an injunction to protect the environment from further logging or thinning until the serious questions now raised are resolved, but that defendant-intervenor D.R. Johnson is entitled to complete the removal of the timber that already has been cut. This removal, including truck and helicopter removal, shall take place through February 15, 2002.

CONCLUSION
Plaintiffs' oral motion for admission of a supplemental declaration by Ralph Bloemers is denied. Plaintiffs' motion for preliminary injunction (doc. # 3) is granted in part and denied in part. The bond in this public interest litigation is waived. See People ex rel. Van De Kamp v. Tahoe Regional Planning, 766 F.2d 1319, 1325-26 (9th Cir.1985) (court has discretion to dispense with the security requirement where requiring security would effectively deny access to judicial review for a non-profit environmental group).
Counsel for plaintiffs shall submit a proposed Order of Injunction after consulting *1273 with the opposing parties and determining whether scheduling for briefing and a hearing for issuance of a permanent injunction is necessary. If scheduling is necessary, the draft Order shall provide a proposed schedule. This Order shall be submitted to the court within ten days of the date of this Opinion and Order.
IT IS SO ORDERED.
NOTES
[1] The Opinion and Order issued on February 12, 2002, is amended for purposes of adding plaintiff Cascadia Wildlands Project to the plaintiffs' caption, above. This plaintiff was omitted erroneously on the February 12, 2002, Opinion and Order.
[2] Formally known as the 1995 "Wildfire and Salvage Logging, Recommendations for Ecologically Sound Post-Fire Salvage Management and Other Post-Fire Treatments," the Beschta Report found evidence that post-fire logging results in additional significant damage to the ecosystem and suggests that there is no ecological need for immediate human intervention on post-fire landscape.