IDAHO SPORTING CONGRESS, and
American Wildlands, Plaintiffs–
Appellants,

v.

Jack Ward THOMAS and United States
Forest Service, Defendants–
Appellees,

and

Intermountain Forest Industry Associa-
tion and Stoddard Lumber Company,
Defendants–Intervenors–Appellees.

No. 97–35339.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 5, 1997.

Decided March 4, 1998.

As Amended on Denial of Rehearing
May 13, 1998.

Marc Fink, Sisters, Oregon, for plaintiffs-appellants.

Nicholas Woychick, Boise, Idaho, for defendants-appellees.

* William W Schwarzer, Senior United States District Court Judge for the Northern District of

Before: FLETCHER and O'SCANNLAIN, Circuit Judges, and SCHWARZER,* District Judge.

FLETCHER, Circuit Judge:

The Idaho Sporting Congress ("ISC") and American Wildlands challenge a decision by the United States Forest Service ("Forest Service") to sell timber in the Miners Creek and West Camas Creek watersheds without producing an Environmental Impact Statement ("EIS") and without addressing the requirements of the Idaho water quality anti-degradation statute. Relying on 1985 and 1990 water quality reports, the Forest Service prepared an Environmental Assessment ("EA") in lieu of an EIS. ISC contends that the Forest Service's actions violate the National Environmental Policy Act ("NEPA"), the National Forest Management Act ("NFMA"), and the Clean Water Act ("CWA"). The district court denied ISC's motion for summary judgment and granted the Forest Service's cross-motion for summary judgment. This court has jurisdiction pursuant to 28 U.S.C. § 1291. We reverse and instruct the Forest Service to prepare an EIS.

## FACTUAL BACKGROUND

This litigation concerns the proposed sale of timber by the Forest Service from the Miners Creek and West Camas Creek drainages in the Targhee National Forest in southeastern Idaho. The proposed Miners Creek timber sale consists of 3.1 million board feet of timber from 970 acres in the Miners Creek and West Camas Creek sub-watersheds. The two streams within the proposed sale area, Miners Creek and West Camas Creek, are inhabited by brook trout, a management indicator species for the Targhee National Forest.

In evaluating the environmental effects of the proposed timber sale, the Forest Service did not prepare an Environmental Impact Statement ("EIS") preparing instead a less

California, sitting by designation.

detailed Environmental Assessment ("EA"). On June 30, 1993, the Forest Supervisor signed a decision notice and Finding of No Significant Impact for the proposed sale, determining that the sale would not significantly affect the quality of the human environment. ISC appealed this decision to the Regional Forester, who thereafter affirmed the Forest Supervisor's decision on April 29, 1994.

In July of 1996, the Forest Service proposed the Camas Creek timber sale of 7.2 million board feet within the Camas Creek watershed. The Forest Service again chose not to prepare an EIS for this sale. As the Camas Creek sale also involves logging timber within the West Camas Creek subwatershed, it potentially impacts the Miners Creek sale. Though the EA for the West Camas Creek Timber sale states that it takes into account all past, present, and future projects within the watershed, the Forest Service chose not to supplement the Miners Creek EA to reflect the cumulative impacts of the West Camas Creek logging.

## STANDARD OF REVIEW

We review de novo the grant and denial of summary judgment. *Oregon Natural Resources Council v. Lowe,* 109 F.3d 521, 526 (9th Cir.1997). We must determine whether the Forest Service's actions were "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 377, 109 S.Ct. 1851, 1861, 104 L.Ed.2d 377 (1989) (applying arbitrary and capricious standard to the adequacy of an EIS under the NEPA); *Lowe,* 109 F.3d at 526 (applying arbitrary and capricious standard to NFMA and NEPA actions); *Texas Mun. Power Agency v. Administrator of United States EPA,* 836 F.2d 1482, 1486 n. 18 (5th Cir.1988) (applying arbitrary and capricious standard to agency actions under the CWA).

■ In determining whether the Forest Service's decision was arbitrary and capricious, we "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh,* 490 U.S. at 378,

109 S.Ct. at 1861. Particularly with respect to the adequacy of an EIS, we apply a 'rule of reason' that requires an agency to take a 'hard look' to determine if the EIS contains a "reasonably thorough discussion of the significant aspects of the probable environmental consequences." *Lowe,* 109 F.3d at 526. However, this "reasonableness" review does not materially differ from an "arbitrary and capricious" review. *Marsh,* 490 U.S. at 377 n. 23, 109 S.Ct. at 1861 n. 23 (noting that "difference between the 'arbitrary and capricious' standard and the 'reasonableness' standard is not of great pragmatic consequence").

## ANALYSIS

### I. EIS REQUIREMENT UNDER NEPA

■ ISC claims that the Forest Service must complete an EIS because there are substantial questions about whether the Miners Creek timber sale will affect water quality and fisheries, and thereby the human environment. NEPA imposes a procedural requirement that an agency must contemplate the environmental impacts of its actions. *Inland Empire Pub. Lands v. United States Forest Serv.,* 88 F.3d 754, 758 (9th Cir.1996) (finding that NEPA is concerned with the process of disclosure, not any particular result). NEPA "ensures that the agency ... will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger [public] audience." *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349, 109 S.Ct. 1835, 1845, 104 L.Ed.2d 351 (1989); *Inland Empire,* 88 F.3d at 758. Therefore, NEPA requires the Forest Service to include an EIS "in every recommendation or report on ... major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). We have held that an EIS *must* be prepared if "substantial questions are raised as to whether a project ... *may* cause significant degradation of some human environmental factor." *Greenpeace Action v. Franklin,* 14 F.3d 1324, 1332 (9th Cir.1992) (citation omit-

ted); *Sierra Club v. United States Forest Serv.,* 843 F.2d 1190, 1193 (9th Cir.1988). To trigger this requirement a "plaintiff need not show that significant effects *will in fact occur,*" raising "substantial questions whether a project may have a significant effect" is sufficient. *Greenpeace,* 14 F.3d at 1332 (emphasis added). ISC asserts that the Forest Service failed to meet NEPA's requirements with respect to water quality, fisheries, and cumulative impact analysis.

## A. WATER QUALITY

■ ISC claims that an EIS is necessary because there are substantial questions as to whether the timber sales will have a significant effect on the water quality of Miners Creek and West Camas Creek. Specifically, ISC argues that the 1990 report failed to conduct standard factual and scientific site specific analysis, and failed to provide the analytical data necessary for any public challenge to the proposed sale. Rather, the 1990 report consists of the expert opinion of Forest Service hydrologist Mark Moultin based on the natural topography of sale area.

Seeking to cure this defect, the district court noted that Moultin, who prepared the 1990 report, had earlier conducted the requisite monitoring and sampling in conjunction with a 1985 logging of the West Camas Creek watershed, and found that Moultin's expertise combined with his 1985 research adequately supported the 1990 study. Similarly, the Forest Service relies on the 1985 report to show that its past management practices have not degraded water quality. Agreeing with the Forest Service and finding that the 1985 report provided sufficient technical support to the 1990 report, the district court concluded that the 1990 report was a "hard look" at water quality issues. We disagree.

■ First, we find that the 1990 report alone does not satisfy NEPA's reporting and notice requirements because it fails to provide the public with a basis for evaluating the impact of the proposed sale. Since the 1990 report relies solely on Forest Service hydrologist Mark Moultin's expert opinion, a successful challenge to the report would entail challenging Moultin's expertise and opinions,

yet, this is the type of challenge we have found impermissible under arbitrary and capricious review. *Greenpeace Action v. Franklin,* 14 F.3d 1324, 1333 (9th Cir.1992) (finding that an agency is entitled to rely on its own scientific opinion of data). As a result, allowing the Forest Service to rely on expert opinion without hard data either vitiates a plaintiff's ability to challenge an agency action or results in the courts second guessing an agency's scientific conclusions. As both of these results are unacceptable, we conclude that NEPA requires that the public receive the underlying environmental data from which a Forest Service expert derived her opinion. In so finding, we note that NEPA's implementing regulations require agencies to "identify any methodologies used and [ ] make explicit reference by footnote to the scientific and other sources relied upon for conclusions" used in any EIS statement. 40 C.F.R. § 1502.24.

We further disagree with the district court's conclusion that the analytical defects in the 1990 report can be repaired by referencing the data from the 1985 report. The 1985 report fails to adequately support or supplement the 1990 report for two reasons: (1) the scope of the 1985 report differs from that of the 1990 report; (2) there are factual differences between the logging done in 1985 and the proposed logging under the Miners Creek timber sale such as the riparian buffers.

First, the 1985 report's section on water quality was limited in scope to the Camas Creek watershed and did not cover Miners Creek. The report even cautioned that

> [s]ince physical characteristics of the inventory area vary so widely, the results from the West Camas Creek drainage cannot be considered to represent the whole area or used in management decisions in areas other than on the drainage from which the measurements were taken.

In addition, the report did not state at what stage of the logging process the monitoring and analysis was conducted and so it remains unclear as to whether the report captured the full effect of logging on water quality.

Second, factual differences exist between the 1985 report and the Miners Creek EA. While the 1985 report noted "a total of 8,861 unit acres of recent or current timber sales within the inventory areas," the report did not clarify where those timber sales were in relation to the riparian areas or how much logging had been completed. Moreover, both the 1990 and 1985 reports are premised on riparian buffers of 100 feet. In contrast, the Miners Creek timber sale contract allows riparian buffers of 25 to 75 feet. Absent an explanation of how a report premised on logging with a 100 foot riparian buffer supports finding no significant water quality effects from logging with a 25 foot riparian buffer, we conclude that the Forest Service decision was arbitrary and capricious.[1] Given these limitations, we hold that the Forest Service cannot rely on the 1985 report as an adequate backup to the 1990 report.

Substantial questions remain as to the effect that the Miners Creek timber sale will have on the human environment. The 1990 report indicates that Miners Creek currently has an excess of sediment and that "[a]dditional sediment would further degrade the system." In light of the failure to provide adequate data to the public, we conclude that an EIS is necessary to explore the substantial questions in respect to whether and what significant effects the sale may have.

*Mitigation.*

▪ The Forest Service also argues that water quality will not be affected by the proposed logging because of the mitigation measures described in the EA that will be undertaken. However, since the effects of the sale will not be known until the EIS is prepared we cannot know whether the mitigation measures are sufficient. In the context of an EIS, an agency is required to "discuss the extent to which adverse effects can be avoided" by mitigation measures. *Robertson,* 490 U.S. at 352, 109 S.Ct. at 1847. "A mere listing of mitigation measures is insufficient to qualify as the reasoned discussion required by the NEPA." *Northwest Indian Cemetery Protective Assoc. v. Peterson,* 795 F.2d 688, 697 (9th Cir.1986), *rev'd on*

other grounds, *Lyng v. Northwest Indian Cemetery Protective Assoc.,* 485 U.S. 439, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988). Without analytical data to support the proposed mitigation measures, we are not persuaded that they amount to anything more than a "mere listing" of good management practices.

## B. FISHERIES

ISC claims that the Forest Service failed to analyze the potential effects of the timber sale on fisheries, and that the Forest Service failed to adequately notify the public what trout inhabited the sale area streams. These claims implicate both of NEPA's disclosure goals, i.e., to insure the agency has fully contemplated the environmental effects of its action and to insure the public has sufficient information to challenge the agency. *See, e.g., Inland Empire,* 88 F.3d at 758.

Trout are designated as a management indicator species for the Targhee National Forest. The Forest Service designates management indicator species "because their population changes are believed to indicate the effects of management activities." 36 C.F.R. § 219.19(a)(1). Once an indicator species is selected, the Forest Service is obligated to evaluate and state planning alternatives "in terms of both amount and quality of habitat and of animal population trends of the management indicator species." 36 C.F.R. § 219.19(a)(2); *Inland Empire,* 88 F.3d at 762. Forest Service biologist Dan Delany stated that streams within the sale area, West Camas and Miners Creek, support populations of brook trout.

*Public notification of trout.*

▪ Under NEPA the Forest Service has an obligation to notify the public that trout populations are present in Miners Creek and West Camas Creek. Agency regulations require that public information be of "high quality" because "[a]ccurate scientific analysis, expert agency comments, and *public scrutiny* are essential to implementing NEPA." 40 C.F.R. § 1500.1(b) (emphasis added).

---

1. It is unclear whether the proposed timber sale actually does involve logging within 100 feet of a riparian area but the mitigation measures allow logging up to a 25 foot buffer.

■ The Forest Service contends that the presence of trout was fully disclosed in the Miners Creek EA by a passage that reads "the West Camas Creek drainage on either side of Alex draw receives light to moderate fishing pressure in the summer months." As this vague and nonspecific reference is the last sentence in a paragraph on the bottom of the second page of a three page description concerned with birds, beasts, and livestock, it does not amount to "full disclosure" for purposes of NEPA.[2] The Miners Creek EA merely states: "Fisheries—no significant concerns. Soil and water analysis and applicable mitigation for protection of streams will mitigate possible effects." Significantly, the EA does not list trout in the section addressing "Wildlife." Therefore, we find that these disclosures are insufficient under NEPA. They do not adequately disclose the existence of a management indicator species, trout, within the boundaries of the sale area and provide no analysis for the public to review.

*Agency contemplation of environmental effects on trout.*

ISC also argues that the second goal of NEPA, agency contemplation, was not accomplished. Given the existence of brook trout and the potential effects of sediment on Miners Creek and West Camas Creek, ISC contends that the Forest Service was arbitrary and capricious in not producing an EIS. The EIS that we conclude the Forest Service must prepare should address these potential effects.

## C. CUMULATIVE IMPACTS

■ After the Forest Service approved the Miners Creek timber sale, it proposed another timber sale near West Camas Creek. Since both sales affect the West Camas Creek watershed, ISC contends that the Forest Service is obligated to supplement its EA with an EIS to account for the cumulative impacts of the two sales.

■ In *Save the Yaak Comm. v. Block,* we concluded that when agency projects have the potential for cumulative harm an "assessment of connected actions is necessary even if the impact of the proposed action is not significant." 840 F.2d 714, 720 (9th Cir. 1988). However, our decision in *Yaak* does not mandate the creation of a supplemental EIS or EA in all cases. *See id.* The standard for a supplemental EA and EIS is whether there have been "significant changes in the proposed action." *Price Rd. Neighborhood Ass'n v. United States Dept. of Transp.,* 113 F.3d 1505, 1509 (9th Cir.1997) (holding that the standard for supplementing an EA is the same as for an EIS).

While the Miners Creek EA did not address the cumulative impacts of the West Camas Creek timber sale, the Forest Service claims that it did a cumulative impacts analysis in the West Camas Creek EA that accounted for the Miners Creek sale. Since the West Camas Creek EA indicates no significant impacts in conjunction with the Miners Creek timber sale, no supplemental EA or EIS is needed. We would find no difference in the result if the Forest Service studies the impact of the West Camas Creek sale on Miners Creek or the impact of the Miners Creek sale on West Camas Creek. It need be done in only one of the studies. The Forest Service expressly states that the "Miners Creek [timber sale] was evaluated in the cumulative effects analysis in the Camas Creek EA." Since the effects of the two sales were accounted for in the West Camas Creek cumulative impacts analysis, we do not require duplication in the Miners Creek EA. However, that does not answer the question of whether the study was adequate. We note that evidence of the Forest Service's cumulative impact study is sparse. However, since we require an EIS, any inadequacy in the analysis of cumulative impacts can be addressed there.

---

**2.** We also note that in its summary judgment memorandum before the district court, the Forest Service argued that this quote did not indicate that trout were present in Miners Creek. There the Forest Service claimed that "it is difficult to imagine ... exactly how any of the planned logging activities might affect the 'access and dispersal' of a group of *non-existent* fisherman, looking for *non-existent* trout in the intermittently flowing tributaries that 'feed' Miners Creek."

## II. IDAHO WATER QUALITY STAN-DARDS AND THE CWA

 ISC contends that Idaho's antidegradation policy requires the Forest Service to maintain existing water quality levels unless a formal determination is made that lowering water quality is necessary for social or economic reasons.[3] Under the Clean Water Act, all federal agencies must comply with state water quality standards, including a state's antidegradation policy. 33 U.S.C. § 1323(a). Judicial review of this requirement is available under the Administrative Procedure Act. *Oregon Natural Resources Council v. United States Forest Service*, 834 F.2d 842, 852 (9th Cir.1987).

Idaho's antidegradation policy provides that:

The existing instream beneficial uses of each water body and the level of water quality necessary to protect those uses shall be maintained and protected. Where the quality of waters exceeds levels necessary to support propagation of fish, shellfish and wildlife and recreation in and on the water, that quality *shall be maintained* unless the department finds . . . that lowering water quality is necessary to accommodate important economic or social development in the area in which the waters are located.

Idaho Code § 39–3603 (emphasis added). While the Code uses mandatory language, the preamble to the Code is explicit that the Idaho legislature intended to meet only the federal minimum requirements.

It is the intent of the legislature that the state of Idaho fully meet the goals and requirements of the federal clean water act and that the rules promulgated under this act not impose requirements beyond those of the federal clean water act.

Idaho Code § 39–3601. The federal antidegradation policy requires only that "[e]xisting instream water uses and the level of water quality necessary to protect the existing uses shall be maintained and protected." 40 C.F.R. § 131.12. Since no Idaho court has

addressed this conflict, we must determine whether the expressed legislative intent in the preamble or the plain language of the statute will control.

Under the plain language of the statute, ISC contends that the Forest Service would have to show that there are *no* effects on water quality, i.e., no sediment, even if it did not change the water quality for beneficial uses. Under ISC's reading of the statute, the Idaho antidegradation policy presents an absolute bar to any adverse effects on water quality. We are persuaded however by the legislative intent that only obligates the Forest Service to maintain the federal standard as set forth in 33 U.S.C. § 1313 and 40 C.F.R. § 131.12. We recognize that "water quality" represents a quality range and not a single point. However, until further studies are completed on the two streams, we lack sufficient facts to determine whether Idaho's antidegradation statute has been violated.

## III. NFMA CLAIMS

 ISC makes two main arguments under the NFMA: that the Forest Service failed to monitor population trends of trout and to determine the relationship of population to habitat changes as required by 36 C.F.R. § 219.19, and that the Forest Service failed to monitor trout as required by Targhee National Forest Land Management Plan ("Targhee LMP").

The NFMA imposes substantive duties on the Forest Service that include providing for "diversity of plant and animal communities." *Inland Empire*, 88 F.3d at 759. Specifically, the Forest Service is obligated to maintain sufficient habitat, 36 C.F.R. § 219.19, and to monitor the population trends of the management indicator species, 36 C.F.R. § 219.19(a)(6). However, in *Inland Empire*, we deferred to the Forest Service's interpretation of these regulations to find that the Forest Service can fulfill their population monitoring requirement by maintenance of sufficient habitat. 88 F.3d at 760. As in *Inland Empire*, the Forest Service has con-

---

**3.** The Forest Service argues that ISC failed to preserve this claim for appeal. We disagree. First, ISC did not limit its complaint to Camas Creek and Beaver Creek. Second, ISC's brief to the district court makes a three page argument addressing the Idaho water quality issues with respect to Miners Creek and West Camas Creek, the two creeks within the forest boundaries.

cluded that trout will not be affected by the Miners Creek timber sale. We agree that using habitat as a proxy for population is not arbitrary and capricious. Upon reevaluation of water quality issues under an EIS, the Forest Service can use habitat to satisfy NFMA requirements if it demonstrates no appreciable habitat disturbance from sediment entering the streams from the proposed timber harvest.

■ Next, ISC argues that the Targhee LMP also requires the Forest Service to "monitor trout populations on streams which will be affected by Forest activities." Under 16 U.S.C. § 1604(i), Forest Service site specific plans must be consistent with the forest-wide Land Management Plan ("LMP"). *Id.* at 757. However, as with federal regulations in *Inland Empire,* we defer to the Forest Service's expertise in interpreting its LMP. 88 F.3d at 760. We note that, in the sentence preceding the language cited by ISC, the Targhee LMP provides for monitoring habitat quantity and quality. So like *Inland Empire,* the LMP issue at stake is one of scientific methodology, i.e., how best to track trout populations. *Id.* Therefore, as in *Inland Empire,* we find that the Forest Service's decision to use habitat as a proxy for fish populations was not arbitrary and capricious. The Forest Service should address in an EIS the adequacy of the habitat maintained.

## CONCLUSION

We hold that the Forest Service has failed to meet its NEPA requirements for public disclosure of information and has failed to take a "hard look" at the effects of the proposed timber sales. The Forest Service must complete an EIS. Other issues cannot be decided without the EIS. We hold that the standard for judging the quality of the water under Idaho law is the federal standard. The judgment of the district court is REVERSED and the Forest Service is directed to prepare an EIS before deciding whether to proceed with the Miners Creek timber sale.

REVERSED.