LEAGUE OF WILDERNESS DEFEND-
ERS—Blue Mountains Biodiversity
Project, League of Wilderness Defend-
ers—Cascadia Forest Ecology Edu-
cation Project, Cascadia Wildlands
Project, and Northwest Environmen-
tal Defense Center, Plaintiffs,

v.

Elaine MARQUIS–BRONG, in her offi-
cial capacity as State Director of the
Bureau of Land Management for
Washington and Oregon, and the Bu-
reau of Land Management, an agency
of the United States Department of
the Interior, Defendants.

No. CIV.02–75 HA.

United States District Court,
D. Oregon.

April 18, 2003.

Christopher G. Winter, Ralph O. Bloemers, Cascade Resources Advocacy Group, Portland, for Plaintiffs.

Michael Mosman, United States Attorney, Thomas C. Lee, Assistant U.S. Attorney, Roger W. Nesbit, Special Assistant U.S. Attorney, Office of the Regional Solicitor, Portland, for Federal Defendants.

Scott W. Horngren, Julie A. Weis, Haglund Kirtley Kelley & Horngren, L.L.P., Portland, for Intervenor–Defendant D.R. Johnson Lumber Company.

## OPINION AND ORDER

HAGGERTY, District Judge.

On February 12, 2002, this court ordered a preliminary injunction to halt salvage logging being undertaken pursuant to a plan implemented by defendant Bureau of Land Management ("BLM"). This plan sought to allow logging of over seven million board feet of timber from an area within the Central Oregon Resource Area that was burned in the Summer, 2001, Monument wildfires. The plan, known as the Timber Basin Wildfire Rehabilitation and Timber Salvage, (hereinafter referred to as the "Timber Basin plan," or "the plan"), called for cutting 4.4 million board feet of burned trees and 2.5 million board feet of unburned trees from over 900 acres pursuant to the BLM's Environmental Assessment ("EA").

The parties agree that the harvesting of the burned trees was essentially complete at the time of the injunction. A few weeks after the preliminary injunction was entered, defendants moved to dismiss the case as moot on grounds that the remaining aspects of the Timber Basin plan had been abandoned by the BLM. Specifically, after another environmental group (the "Friends of Rudio Mountain") had appealed the thinning portion and other rehabilitation portions of the plan to the Interior Board of Land Appeals ("IBLA") the BLM wrote a letter to the IBLA amending its Decision Record by withdrawing those portions of the plan. In light of its voluntary withdrawal the BLM subsequently argued to this court that the case was rendered moot because the legal adequacy or inadequacy of the Timber Basin EA was no longer at issue.[1]

---

1. Plaintiffs strongly opposed dismissing on mootness. The Supreme Court recognizes a high standard for such dismissals: "It is well-

settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the

This court orally denied defendants' Motion to Dismiss for Mootness following a hearing on April 12, 2002, and signed a formal Order entering the preliminary injunction on that date. The parties subsequently stipulated to resolving this litigation through cross motions for summary judgment. Defendants then waived their opportunity for filing such a motion. Plaintiffs filed a motion seeking summary judgment on July 11, 2002.

The parties briefed this motion, as well as a related motion from plaintiffs to strike the declaration of Ed Horn. Oral argument was heard on April 14, 2003. For the following reasons plaintiffs' motions are granted.

## STANDARDS

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, a moving party is entitled to summary judgment as a matter of law "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c); *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir.1991). The moving party bears the initial burden of proof. *See Rebel Oil Company, Inc. v. Atlantic Richfield Company*, 51 F.3d 1421, 1435 (9th Cir. 1995). The moving party meets this burden by identifying portions of the record on file which demonstrates the absence of any genuine issue of material fact. *Id.*

In assessing whether a party has met their burden, the court must view the evidence in the light most favorable to the nonmoving party. *Allen v. City of Los An-geles*, 66 F.3d 1052 (9th Cir.1995). All reasonable inferences are drawn in favor of the nonmovant. *Id.* If the moving party meets their burden, the burden shifts to the opposing party to present specific facts which show there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Auvil v. CBS "60 Minutes"*, 67 F.3d 816 (9th Cir.1995). The nonmoving party cannot carry their burden by relying solely on the facts alleged in their pleadings. *Leonard v. Clark*, 12 F.3d 885, 888 (9th Cir.1993). Instead, their response, by affidavits or as otherwise provided in Rule 56, must designate specific facts showing there is a genuine issue for trial. *Id.*

## BACKGROUND

The history leading to this litigation was addressed thoroughly in this court's Opinion granting the preliminary injunction, and will be reviewed only briefly here. On October 31, 2001, the BLM released an EA for the Timber Basin plan, and on November 28, 2001 BLM signed the Decision Record. On November 29, 2001, BLM issued the Finding of No Significant Impacts ("FONSI").

On December 13, 2001, plaintiffs filed a "Protest" asking that the plan be stayed and that the FONSI be amended so as to make it consistent with the National Environmental Policy Act ("NEPA"). The Protest was denied and the request for a stay ignored. On January 10, 2002, BLM awarded the Timber Basin sale contract to D.R. Johnson, a commercial logging company and the intervenor-defendant. The company began cutting trees on January 11, 2002.

---

legality of the practice. If it did, the courts would be compelled to leave the defendant free to return to his old ways. * * * [A] defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrong behavior could not reasonably be expected to occur." *Friends of the Earth, Inc. v. Laidlaw Environmental Services*, 528 U.S. 167, 189–90, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). Plaintiffs argued that by withdrawing the green-tree thinning portion of the project before the IBLA issued a ruling, the BLM was still free to renew the thinning later. This court agreed and denied defendants' Motion to Dismiss for Mootness.

Plaintiffs sought a temporary restraining order ("TRO") and a preliminary injunction on January 18, 2002. The TRO was denied, and a hearing on the preliminary injunction was set for February 12, 2002. By Opinion and Order issued that day this court granted an injunction in part, and required plaintiffs to draft a proposed order.

Plaintiffs sought a 30–day extension for filing the proposed order, and during that period defendants moved to dismiss the action for mootness, as discussed above. This motion was denied and on April 12, 2002, the preliminary injunction Order was issued, which provides as follows:

> Order that defendants, defendant-intervenor and their officers, agents, etc. and all other persons in active concert or participation with any of them who receive notice of this order by personal service or otherwise, are directed to immediately cease further implementation of the timber harvest portion of the Timber Basin Project, except as noted in this order.

Subsequently, plaintiffs moved for summary judgment in the form of a permanent injunction prohibiting defendants from logging Timber Basin without first preparing an Environmental Impact Statement ("EIS"). Defendants say they have no intention of permitting any logging in Timber Basin before another EIS is completed, but nevertheless oppose plaintiffs' motion.

## QUESTIONS PRESENTED

By their motion for summary judgment Plaintiffs seek: 1) a declaratory judgment and mandatory injunction requiring the defendants to comply with NEPA by preparing an EIS; 2) a permanent injunction barring defendants from permitting logging, or otherwise proceeding with, the Timber Basin logging plan until a legally adequate EIS is prepared; 3) a declaratory judgment establishing that proceeding with the Timber Basin logging project is not in accordance with applicable law, and would be an arbitrary and capricious agency action in violation of NEPA and the Administrative Procedure Act ("APA"); and 4) a permanent injunction barring defendants from permitting logging, or otherwise proceeding with, the Timber Basin logging plan until defendants demonstrate adequate and full compliance with all mandatory applicable provisions of NEPA and the APA. Plaintiffs also seek costs and attorney's fees.

Defendants assert that a permanent injunction would be inappropriate, and that the controversy presented to the court— whether defendants violated NEPA in relying upon an EA instead of an EIS for the Timber Basin project—presents no grounds for an injunction. Although plaintiffs contend that without an injunction defendants would be free to return to activity that allegedly violates NEPA, defendants assert that they cannot undertake any additional salvage logging, restoration, or green tree thinning operations without first initiating a new decision-making process that includes public notices, reviews, opportunities for protests and appeals, and the development of a new EA. According to Christina Welch, Acting Forest Supervisor for the Ochoco National Forest, the BLM withdrew its plans to thin green trees last year, and has no plans to renew any activities regarding this project:

> The Central Oregon Resource Area is in the preliminary stages of preparing a Resource Management Plan (RMP) associated Environmental Impact Statement (EIS) with regard to management of lands in the John Day Basin. During this process forest lands and commercial timber will be a resource considered. Until this RMP/EIS is completed the BLM has no intention of revisiting any type of forest treatment in the Timber Basin area. Any future actions the

BLM would propose to take in the Timber Basin Area will be associated with the development of the appropriate NEPA documents and be open for public scrutiny and appeal.

2nd Declaration of Christina Welch at Para. 4.

## ANALYSIS

### A. Mootness/Live Controversy

 As noted above, defendants respond to plaintiffs' motions by first returning to last year's rejected mootness arguments. A case becomes moot when it " 'los[es] its character as a present, live controversy of the kind that must exist if we are to avoid advisory opinions on abstract propositions of law.' " *Cantrell v. City of Long Beach*, 241 F.3d 674, 678 (9th Cir.2001) (quoting *Hall v. Beals*, 396 U.S. 45, 48, 90 S.Ct. 200, 24 L.Ed.2d 214 (1969)) (alteration in original).

In a decision issued by the Ninth Circuit last year in which the district court had denied a preliminary injunction against certain challenged logging, the appeal to the Ninth Circuit was heard after the logging in dispute had been completed. On that appeal the defendants argued the plaintiffs' challenge was moot. The Ninth Circuit disagreed:

> One might assume that defendants must be correct, for the logging at issue has been completed. Our cases, however, make clear that completion of activity is not the hallmark of mootness. Rather, a case is moot only where no effective relief for the alleged violation can be given. *See [Cantrell*, 241 F.3d] at 678 (holding that completion of the action challenged does not moot a case where there can still be "any effective relief" for alleged harm); *Northwest Envtl. Defense Ctr. v. Gordon*, 849 F.2d 1241, 1244–45 (9th Cir.1988).

*Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1065 (9th Cir.2002).

The Ninth Circuit refused to hold the dispute moot "simply because the violation (if any) has already occurred," reasoning that the plaintiff had alleged that the challenged sale unlawfully harmed old growth species, and that remedies for this alleged harm were still available:

> Although of course the logged trees cannot be brought back, the court below might order other measures to help mitigate the damage caused by the sale. For instance, it could order the Forest Service to study the sale's impacts on species viability, and, if necessary, to mitigate those impacts in both the area of the sale and elsewhere in the forest. If warranted, it might order the Forest Service to adjust future timber plans to compensate for this allegedly unlawful one. Or, the remedy could take the form of a more direct species population intervention, such as monitoring the birds' population trends and developing, if necessary, artificial habitats for their recovery. Because "effective relief may still be available to counteract the effects of the violation, the controversy remains live and present."

*Id.* at 1066 (citations and footnote omitted). The court also noted that there was no need to rule upon the propriety of particular kinds of equitable relief that might or might not be granted in the future; "it is sufficient to conclude that some form of effective relief is still available." *Id.* at n. 5, quoting *Gordon*, 849 F.2d at 1245 n. 6.

 In this case, only a portion of the challenged plan has been completed, and despite defendants' voluntary cessation regarding the thinning of green trees, effective relief pertaining to the thinning and other incomplete aspects of the plan can still be granted. Plaintiffs raised serious concerns about soil compaction, erosion, and cumulative impacts in their protests to the BLM, and such harms could be miti-

gated by a court order banning logging activities until an EIS is prepared.

Moreover, defendants' assertion that they have "no intention of revisiting any type of forest treatment in the Timber Basin area" falls short of meeting their "formidable burden of showing that it is absolutely clear the allegedly wrong behavior could not reasonably be expected to occur." *Laidlaw,* 528 U.S. at 189–90, 120 S.Ct. 693. Last year defendants ignored plaintiffs' request for a voluntary stay of logging and permitted the burned logs to be removed before judicial review was possible, and it is reasonably plausible that they could adopt a similar posture after electing to re-initiate the plans for green-tree thinning. Accordingly, the portion of defendants' opposition to plaintiffs' pursuit of summary judgment and a permanent injunction that is based upon alleged mootness or the presumed lack of a "live controversy" is rejected.

## B. Tiering Argument

■ Defendants also contend that their reliance upon the Timber Basin EA was adequate in light of the existence of a prior Resources Management Plan ("RMP") and Environmental Impact Statement that was completed in 1985 for the John Day Resource Area (hereinafter referred to as the "John Day RMP" or the RMP). That management plan allocated the lands involved in the Timber Basin Project to be used for commercial forestry. Defendants assert that the EA in question was adequately "tiered" to this comprehensive EIS, and that therefore no other supplemental EIS ("SEIS") was necessary.

"Tiering" refers to the coverage of general matters in broader environmental impact statements (such as national program or policy statements) with subsequent narrower statements or environmental analyses (such as regional program statements or site-specific statements) that incorporate by reference the general discussions and concentrate solely on the issues specific to the statement subsequently prepared. 40 C.F.R. § 1508.28. Defendants assert that the Timber Basin plan complies with the John Day RMP, since no cumulative impacts were found that exceeded those already identified and discussed in the 1985 plan.

Defendants' reliance upon this 1985 EIS and Management Plan is misplaced. The Ninth Circuit has addressed when an SEIS is required:

> NEPA requires federal agencies to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). This requirement serves a dual role: "It ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). Stated differently, NEPA's purpose is to ensure that "the agency will not act on incomplete information, only to regret its decision after it is too late to correct." *Marsh,* 490 U.S. [360,] 371, 109 S.Ct. 1851, 104 L.Ed.2d 377 [ (1989) ].

> In view of this purpose, an agency that has prepared an EIS cannot simply rest on the original document. The agency must be alert to new information that may alter the results of its original environmental analysis, and continue to take a "hard look at the environmental effects of [its] planned action, even after a proposal has received initial approval."

*Id.* at 374, 109 S.Ct. 1851 (citations and quotations omitted). It must "ma[ke] a reasoned decision based on... the significance—or lack of significance—of the new information," *id.* at 378, 109 S.Ct. 1851, and prepare a supplemental EIS when there are "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii). "If there remains major Federal action to occur, and the new information is sufficient to show that the remaining action will affect the quality of the human environment in a significant manner or to a significant extent not already considered, a supplemental EIS must be prepared." *Marsh,* 490 U.S. at 374, 109 S.Ct. 1851 (citations and quotations omitted).

*Friends of the Clearwater v. Dombeck,* 222 F.3d 552, 556–58 (2000) (footnote omitted).

▮▮▮▮ An agency "need not supplement an EIS every time new information comes to light after the EIS is finalized. To require otherwise would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made." *Headwaters v. BLM,* 914 F.2d 1174, 1177 (9th Cir.1990) (footnotes and citations omitted). The court's reasoning in *Headwaters* continues, however:

NEPA requires that the agency take a "hard look" at the new information to determine whether an SEIS is necessary. *Id.* at 1859, 1865. The agency decision whether new information requires an SEIS is reviewed under the arbitrary or capricious standard. *Id.* at 1860 (whether to file an SEIS "is a classic example of a factual dispute the resolution of which implicates substantial agency expertise"). [I]n making the factual inquiry concerning whether an agency decision was "arbitrary or capri-

cious," the reviewing court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." This inquiry must "be searching and careful," but "the ultimate standard of review is a narrow one." * * * [I]n the context of reviewing a decision not to supplement an EIS, courts should not automatically defer to the agency[ ]... without carefully reviewing the record and satisfying themselves that the agency has made a reasoned decision based on its evaluation of the significance—or lack of significance—of the new information.

*Id.,* citing *Marsh.*

The Ninth Circuit considered and rejected an argument similar to defendants' position in the court's decision in *Blue Mountains Biodiversity Project v. Blackwood,* 161 F.3d 1208, 1212 (9th Cir.1998), *cert. denied,* 527 U.S. 1003, 119 S.Ct. 2337, 144 L.Ed.2d 235 (1999) ("*Blackwood*"). There, the Forest Service distinguished the decision in *Oregon Natural Resources Council v. Lyng,* 882 F.2d 1417, 1422–24 (9th Cir.1989), in which the Ninth Circuit held that an SEIS was unnecessary for the Forest Service's decision to log six million board feet of dead and insect-infested trees by cable and helicopter systems to avoid building a road into an unroaded portion of a forest.

The Ninth Circuit in *Blackwood* refused to apply the *Lyng* reasoning to a post-fire timber plan, recognizing that a catastrophic fire "dramatically altered" the forest ecosystem several years after an EIS had contemplated logging in that forest. "The [previous] Forest Plan EIS does not, and could not, evaluate the impacts of this catastrophic fire, or the additional environmental impacts that large scale logging of severely burned areas could bring." *Blackwood,* 161 F.3d at 1213.

Accordingly, the *Blackwood* court rejected the Forest Service's reliance upon a global EIS for the Umatilla National Forest Plan (which the Ninth Circuit explicitly pointed out was also prepared several years before the fire at issue), recognizing the forest plan's EIS could not provide adequate disclosure and concern for the cumulative effects of a post-fire timber harvest. The Ninth Circuit faulted the post-fire EA for several reasons, including giving a "cursory and inconsistent treatment of" sedimentation issues, and the court concluded the EA in question "simply fails to persuade that no significant impacts would result from the [post-fire] project." *Blackwood*, 161 F.3d at 1213–14.

Similarly, defendant's opposition to plaintiffs' motions on grounds that the 1985 John Day RMP validates the Timber Basin EA is unpersuasive. The RMP was prepared years before the Monument wildfires and never evaluated the impacts of a catastrophic fire or the additional environmental impacts that could be inflicted by the large scale logging of severely burned areas. Under the guidance provided by the Ninth Circuit in *Blackwood*, this court is compelled to reject defendants' theory that the 1985 RMP/EIS for the John Day Resource Area can be relied upon for accepting the validity of the EA being challenged by plaintiffs.

## C. The Merits

■ Defendants' attempted refutation of plaintiffs' motion for summary judgment on the merits also fails. This court granted the preliminary injunction in this case after recognizing the serious questions raised by plaintiffs' assertions that the BLM (1) improperly disregarded sound scientific evidence that post-fire salvage logging likely results in "persistent, significant environmental impacts;" (2) omitted discussion in the EA of the "Beschta Report,"[2] and addressed these issues only after the decision-making process was complete and portions of the public raised concerns; (3) failed to consider the cumulative impacts of fire suppression activities, grazing and logging on BLM and adjacent lands; and (4) failed to consider a reasonable range of alternatives when it excluded a restoration alternative that omitted salvage logging. After further review of the Administrative Record ("AR"), and after consideration of the parties' briefing and their testimony and arguments presented at the hearings conducted in this case, this court concludes plaintiffs are now entitled to summary judgment regarding defendants' failure to comply with NEPA.

As already discussed in this court's ruling granting plaintiffs' request for a preliminary injunction, NEPA was drafted to foster better decision-making and to permit informed public participation for actions affecting humans and nature. 42 U.S.C. § 4321; 40 C.F.R. § 1501.1(c). Under NEPA, a federal agency prepares an EA to decide whether the environmental impact of a proposed action is significant enough to warrant preparation of an EIS. 40 C.F.R. § 1508.9. The EA should be a "concise public document that briefly provide[s] sufficient evidence and analysis

**2.** Formally known as the 1995 "Wildfire and Salvage Logging, Recommendations for Ecologically Sound Post–Fire Salvage Management and Other Post–Fire Treatments," the Beschta Report found evidence that post-fire logging results in additional significant damage to the ecosystem and suggests that there is no ecological need for immediate human intervention on post-fire landscape. In the view of the Ninth Circuit in *Blackwood*, the failure of the Forest Service to discuss the Beschta Report's recommendations lent weight to the plaintiffs' claims that the Forest Service "did not take the requisite 'hard look' at the environmental consequences of post-fire logging...." *Blackwood*, 161 F.3d at 1213.

for determining whether to prepare an EIS or a finding of no significant impact." *Id.*

This court concludes that the Timber Basin plan EA was inadequate in several specific aspects. The EA insufficiently discussed the impacts from fire suppression activities, which resulted in more than two miles of road-building within riparian areas and 28 stream crossings. This failure underscores the EA's overall inadequacy pertaining to the consideration of the cumulative effects of the salvage logging and green-tree-thinning aspects of the Timber Basin plan. Government agencies must be sensitive to the possible "*cumulative impact*" of their conduct that when evaluated individually may be insignificant, but which might become significant when considered cumulatively (such as grazing, forest practices on adjacent private land, and other past, present or future foreseeable projects). *See* 40 C.F.R. § 1508.7. The *Blackwood* court instructed:

> In determining whether a project will have a "significant" impact on the environment, an agency must consider "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts." 40 C.F.R. § 1508.27(b)(7). If several actions have a cumulative environmental effect, "*this consequence must be considered in an EIS.*"

*Blackwood,* 161 F.3d at 1214 (some citations omitted; emphasis added).

The EA for the Timber Basin plan failed to address adequately the applicable cumulative impacts. In addition to the limited analysis of fire-fighting activities in the Timber Basin area, it did not fairly address the pre-EA "initial comments from the Oregon Department of Fish and Wildlife" concerning "a loss of big game hiding and thermal cover resulting from the cumulative effects of the fire, logging, graz-

ing, and other management activities on adjoining private lands." AR at 427. The EA also failed to adequately address defendants' assumption that a pond on adjacent private lands would reduce sediment activity sufficiently. This omission was particularly notable in light of the lack of any supporting analysis or examination of the effects of peak flows or flooding in the area.

Moreover, the EA unreasonably excluded consideration of any alternative that provided for restoration of the burned area without salvage logging. While defendants looked at a "rehabilitation-only" alternative initially, the EA itself presented three action alternatives, and each of the three included salvage logging. Defendants' prior assertion that a rehabilitation-only alternative would be inconsistent with the 1985 RMP/EIS, which allowed for commercial logging in the Timber Basin area, was belied by undisputed testimony at the preliminary injunction hearing that indicated the Resource Management Plan does not preclude rehabilitation-only alternatives. Additionally, a logging project is not necessarily exempt from a project-specific EIS simply because an EIS for a forest plan contemplates that logging may occur. *Blackwood,* 161 F.3d at 1214.

 Finally, this court concludes that an EIS should have been prepared. NEPA requires an EIS for all "major Federal actions significantly affecting the quality of the human environment," 42 U.S.C. § 4332(2)(C). Agencies draft an EA to determine whether its project will significantly effect the environment and thereby trigger an EIS. If an agency decides not to prepare an EIS, as is the case here, it must supply a "convincing statement of reasons" to explain why a project's impacts are insignificant. *Save the Yaak Comm. v. Block,* 840 F.2d 714, 717 (9th Cir.1988). "The statement of reasons is

crucial to determining whether the agency took a 'hard look' at the potential environmental impact of a project." *Id.* As the Ninth Circuit recognizes:

NEPA imposes a procedural requirement that an agency must contemplate the environmental impacts of its actions. *Inland Empire Pub. Lands v. United States Forest Serv.,* 88 F.3d 754, 758 (9th Cir.1996) (finding that NEPA is concerned with the process of disclosure, not any particular result). NEPA "ensures that the agency . . . will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger [public] audience." *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989); *Inland Empire,* 88 F.3d at 758. Therefore, NEPA requires the Forest Service to include an EIS "in every recommendation or report on . . . major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). We have held that an EIS *must* be prepared if "substantial questions are raised as to whether a project . . . *may* cause significant degradation of some human environmental factor." *Greenpeace Action v. Franklin,* 14 F.3d 1324, 1332 (9th Cir.1992) (citation omitted); *Sierra Club v. United States Forest Serv.,* 843 F.2d 1190, 1193 (9th Cir.1988). To trigger this requirement a "plaintiff need not show that significant effects *will in fact* occur," raising "substantial questions whether a project may have a significant effect" is sufficient. *Greenpeace,* 14 F.3d at 1332.

*Idaho Sporting Congress v. Thomas,* 137 F.3d 1146, 1149–50 (9th Cir.1998) (emphasis in original).

When examining whether a proposed project will have "significant" impacts on the environment, an agency must evaluate "the degree to which the effects on the quality of the human environment are likely to be highly controversial," and "the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks." *See* 40 C.F.R. §§ 1508.27(b)(4), (b)(5) (NEPA regulations, promulgated by the Council on Environmental Quality, provide guidance to the courts in reviewing an agency's determination of "significance"); *see also Blackwood,* 161 F.3d at 1212.

Similarly, there are guidelines for when courts must determine whether the effects on the quality of the human environment "are likely to be highly controversial." In *Blackwood,* the Ninth Circuit held that "controversial" is construed as a substantial dispute about the size, nature, or effect of the major federal action, rather than the existence of opposition to a use. *Blackwood,* 161 F.3d at 1212, citing *Greenpeace Action v. Franklin,* 14 F.3d 1324, 1335 (9th Cir.1992); *see also Sierra Club v. United States Forest Service,* 843 F.2d 1190, 1193 (9th Cir.1988) (Forest Service awarded timber contracts containing groves of giant sequoia redwoods without preparing an EIS; after considering evidence from numerous experts showing the EAs' inadequacies and casting serious doubt on the Forest Service's conclusions, the Ninth Circuit held that this was "precisely the type of 'controversial' action for which an EIS must be prepared").

As noted above, to prevail on a claim that a federal agency violated its statutory duty to prepare an EIS, a plaintiff need only raise "substantial questions whether a project may have a significant effect" on the environment. The plaintiff does not have to show that significant effects will in fact occur. *Blackwood,* 161 F.3d at 1212, quoting *Idaho Sporting Congress,* 137 F.3d at 1149.

██ Here, the EA at issue failed to provide a "convincing statement of reasons" to explain why the Timber Basin's plan's impacts were insignificant, *see Save the Yaak,* 840 F.2d at 717, and provided insufficient grounds for determining whether defendants took a hard look at the plan's potential environmental impact. For example, testimony elicited at the preliminary injunction hearing established that neither the EA nor the AR provided hard data for the BLM's critical assumption that 10 inches of snow cover adequately mitigates environmental concerns. The BLM appears to have relied upon a summary of a study from 1975 for this assumption, but the study itself is not in the AR, and no one within the BLM could be identified as having read the study.

The EA also violated NEPA by failing to disclose respected scientific evidence running contrary to the BLM's final decision to allow salvage logging, and because it failed to address the differences between the BLM's view of likely impacts and the view of others in the scientific community (including views expressed in the Beschta Report), and failed to take the "hard look" at post-fire issues as required by NEPA. This court has consistently followed the Ninth Circuit's teaching in *Blackwood* that a forest management agency's failure to discuss and consider the Beschta Report "lends weight to [a plaintiff's] claim that the Forest Service did not take the requisite 'hard look' at the environmental consequences of post-fire logging instead of letting nature do the healing." *Blackwood,* 161 F.3d at 1213.

As stated in the preliminary injunction Opinion, defendants' reliance upon their inclusion of various references and reports in the Administrative Record in an attempt to overcome the EA's deficiencies is unpersuasive. Such belated efforts are insufficient to meet the requirements that an agency's information to the public be of "'high quality' because '[a]ccurate scientific analysis, expert agency comments, and *public scrutiny* are essential to implementing NEPA.'" *Idaho Sporting Congress,* 137 F.3d at 1151 (citation omitted; emphasis in original). Defendants' inclusions regarding agency conduct and their decision-making process fall short of NEPA's two primary goals: insuring the agency has fully contemplated the environmental effects of its action; and insuring the public has sufficient information to challenge the agency. *Idaho Sporting Congress,* 137 F.3d at 1151.

There can be no doubt at this point that post-fire logging is construed as highly controversial, with impacts that are highly uncertain or involve unique or unknown risks. An EIS regarding the Timber Basin plan was necessary to fully explore this controversy and the risks associated with the cumulative impacts of the plan upon the ecosystem that was left in the wake of the Monument fires. Plaintiffs are entitled to summary judgment in the form of a permanent injunction prohibiting defendants from logging Timber Basin without first preparing an EIS.

### D. Plaintiffs' Motion to Strike

Plaintiffs have also filed a Motion to Strike the Declaration of Ed Horn. Horn is a Soil Scientist for the Princeville BLM and was part of the team that prepared the Timber Basin EA. His Declaration was filed by defendants as support for their Opposition to plaintiffs' Motion for Summary Judgment.

██ "When a plaintiff challenges a final agency action, judicial review normally is limited to the administrative record in existence at the time of the agency's decision." *Dombeck,* 222 F.3d at 560. The Ninth Circuit has been vigilant in rejecting the admission of post-decision evidence, out of concern that such admissions would

render the complex decision-making process established by Congress and NEPA "meaningless," and would encourage agencies to produce unsupported decisions that—if challenged—could later be bolstered by a search for after-the-decision evidence. *Arizona Cattle Growers' Ass'n v. U.S. Fish and Wildlife,* 273 F.3d 1229, 1245 (9th Cir.2001).

 Under NEPA, the Ninth Circuit allows extra-record material only under limited circumstances: (1) when necessary to determine whether the agency has considered all relevant factors and has explained its decision; (2) when the agency has relied upon documents not in the record; or (3) when supplementing the record is needed to explain complex subject matters. *Southwest Ctr. for Biological Diversity v. U.S. Forest Serv.,* 100 F.3d 1443, 1450 (9th Cir.1996) (generally, judicial review focuses on administrative record as it existed at the time of the decision).

 Plaintiffs contend the Horn Declaration must be stricken because it presents unsubstantiated opinions about the conditions of logging units *after* the project was underway; discloses information that was never disclosed to the public or included in the administrative record; and provides opinions from an expert without offering the requisite underlying data. For example, Horn details the analytical methods he used to determine whether a downstream pond would be effective as a sediment catch. None of this analysis was provided in the AR, and plaintiffs challenged this failure last year when seeking a preliminary injunction. Plaintiffs complain that Horn's Declaration is defendants' untimely attempt to bolster the inadequate record now, after the preliminary injunction has been entered. The Declaration also reports upon the conditions of logging units, information provided presumably to dispute allegations that the effects of the Timber Basin plan were controversial.

Defendants respond by saying they proffer the Horn Declaration to "explain" the AR, and so the matters about which Horn testifies are not "extra-record," but "further records." Moreover, defendants complain that plaintiffs raised a "new issue" last year at the preliminary injunction hearing when they challenged the agency's conclusions about logging over 10 inches of snow. Defendants argue that "plaintiffs cannot hold back some issues to spring upon the agency during judicial review and then complain that the administrative record is inadequate because the agency did not address their secret issues." Defendants also argue that since evidence exists of "actual events which have taken place since the litigation began which have altered the physical context of the agency's decision, and incidentally confirmed the agency's environmental analysis," this evidence should be permitted.

These arguments fail. The testimony that defendants describe as "explanations" of the AR are portions containing quotations from the AR and a report he submitted previously that is contained in the AR. The material in the Declaration that is outside the AR pertains to the impacts on soil quality within the project area, which are at issue because plaintiffs contend they were controversial and uncertain at the time defendants completed the EA. Horn's Declaration about those impacts do not address whether the impacts were controversial or uncertain at the time of the EA.

Moreover, the allegation that plaintiffs "sprung" their "secret issue" of concerns about snow logging upon defendants during judicial review is specious. The issue of snow logging was raised after plaintiffs repeatedly expressed concerns about soil compaction and erosion in their early letters of protest. Defendants relied upon the presence of snow as a mitigating factor

in regard to plaintiffs' claims about soil compaction in this litigation.

Defendants acknowledge the court cannot "allow the agency to perform the proposed action first and then document the effects." Defendants' Response to the Motion to Strike at 5. This court agrees. Plaintiffs' lawsuit challenges the decision-making process undertaken by defendants. Defendants' attempt to rely upon the Horn Declaration as evidence suggesting the consequences of the decisions defendants made are not objectionable is rejected. Plaintiffs' Motion To Strike the Horn Declaration is granted.

## CONCLUSION

For the reasons provided, plaintiffs' Motion To Strike the Horn Declaration (# 73) is granted. Additionally, plaintiffs' Motion for Summary Judgment (# 58) is also granted as follows:

Plaintiffs are entitled to the issuance of a permanent injunction barring defendants from permitting logging, or otherwise proceeding with, the Timber Basin logging plan until a legally adequate EIS is prepared as well as a declaratory judgment establishing that proceeding with the Timber Basin logging project is not in accordance with applicable law, and would be an arbitrary and capricious agency action in violation of NEPA and the APA. Defendants are permanently enjoined from permitting logging, or otherwise proceeding with, the Timber Basin logging plan until defendants demonstrate adequate and full compliance with all mandatory applicable provisions of NEPA and the APA.

IT IS SO ORDERED.